UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

ANTOINE ROSS,                                    Docket #16CV06704 (PAE)(KNF)

                   Plaintiff

              - against -

CAPTAIN DION WILLIS, CORRECTION
OFFICER GEORGE, SHIELD #732,
CORRECTION OFFICER GENOVES,
SHIELD #17683, and CITY OF NEW YORK,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT DION WILLIS' MOTION FOR SUMMARY JUDGMENT

Frankie & Gentile, P.C.
Attorneys for Defendant
*Dion Willis*
1527 Franklin Avenue
Suite 104
Mineola, New York  11501
(516) 742-6590
Email: frankieandgentile@gmail.com

# TABLE OF CONTENTS

**CONTENTS**                                                                                    **PAGE**

TABLE OF AUTHORITIES                                                                              ii

PRELIMINARY STATEMENT                                                                            1

STATEMENT OF FACTS                                                                                2

ARGUMENT                                                                                          8

    POINT I                                                                    8
    DEFENDANT DION WILLIS SHOULD BE GRANTED SUMMARY JUDGMENT
    BECAUSE HIS CONDUCT DID NOT VIOLATE A CLEARLY ESTABLISHED
    CONSTITUTIONAL RIGHT, AND ON THE GROUNDS OF QUALIFIED
    IMMUNITY BECAUSE HIS ACTIONS WERE NOT OBJECTIVELY
    UNREASONABLE UNDER THE CIRCUMSTANCES PRESENTED.

    POINT II                                                                   21
    DEFENDANT WILLIS WAS NOT DELIBERATELY INDIFFERENT TO
    PLAINTIFF'S MEDICAL NEEDS.  MOREOVER, THIS CLAIM WAS NOT
    PLED AND PURSUIT OF SUCH A CLAIM IS THEREFORE INAPPROPRIATE.

CONCLUSION                                                                                       25

    PLAINTIFF HAS FAILED TO DEMONSTRATE THAT THE ALLEGATIONS
ALLEGED IN THE COMPLAINT, IF TRUE, VIOLATE A CLEARLY
ESTABLISHED CONSTITUTIONAL RIGHT.  ALTERNATIVELY, THE ACTIONS
OF DEFENDANT WILLIS WERE NEITHER OBJECTIVELY UNREASONABLE
NOR RECKLESS.  THEREFORE, HE IS ENTITLED TO QUALIFIED IMMUNITY,
AND SHOULD BE GRANTED SUMMARY JUDGMENT.

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                    <u>PAGES</u>

<u>Anderson v. Creighton</u>, 483 U.S. 635 (1987)                               9, 17, 18
<u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 247 (1986)                8, 9
<u>Bah v. City of New York</u>, 319 F. Supp. 698 (50 NY 2018)                  12, 20
<u>Bell v. Wolfish</u>, 441 U.S. 520, 540, 547 (1979)                          10, 11, 13
<u>Beyer v. County of Nassau</u>, 524 F.3d 160, 163 (2d Cir. 2008)            9
<u>Caldarola v. Calabrese</u>, 298 F.3d 156, 160 (2d Cir. 2002)              8
<u>Farmer v. Brennan</u>, 511 U.S. 825 (1994)                                21
<u>Globecome Grp., LLC v. Hartford Fire Ins. Co.</u>, 434 F.3d 165, 170
(2d Cir. 2006)                                                             8
<u>Graham v. Connor</u>, 490 U.;S. 386, 396 (1989)                           10, 18
<u>Huminski v. Corsones</u>, 396F.3d 53, 69 (2d Cir. 2004)                   8
<u>Ismael v. Charles</u>, No. 18-CV-3957 (GHW) 2020 U.S. District
LEXIS 12429 at *28-*30 (SDNY July 15, 2020)                                12, 18
<u>Kingsley v. Hendrickson</u>, 576 U.S. 389 (2015) 42 U.S.C. §1983          10
<u>Knight v. U.S. Fire Inc. Co.</u>, 804 F.2d 9, 12 (2d Cir. 1986), cert. denied,
580 U.S. 932 (1987)                                                        8
<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586
(1986)                                                                     8
<u>Nielsen v. Robin</u>, 746 F.3d 58, 62 (2d Cir. 2014)                      22
<u>R.G. Group Inc. v. Horn and Hardart Co.</u>, 751 F.2d 69, 77
(2d Cir. 1984)                                                             8
<u>Rizk v. City of New York</u>, No. 14-CV-6434 (RRM)(RER) 2020 U.S. District
LEXIS 90918 at *28-*29 (EDNY May 22, 2020)                                 12, 20
<u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001)                            9, 11, 13, 17, 18
<u>Triestman v. Federal Bureau of Prisons</u>, 470 F.3d 471, 474 (2d Cir. 2006)
<u>Wilson v. Lane</u>, 526 U.S. 603, 615 (1999)                             18


<u>STATUTES</u>

Rules of New York State, Title 40, §1-16(a)                                2

## PRELIMINARY STATEMENT

Defendant Dion Willis submits this memorandum of law in support of his motion for summary judgment.  Defendant Willis respectfully submits that there are no genuine issues of material fact to be tried.  There was no violation of a clearly established constitutional right.  Moreover, Defendant Willis is entitled to qualified immunity and the complaint (5th Amended Complaint) should be dismissed as a matter of law.

Plaintiff Antoine Ross, while a detainee inmate on Rikers Island, New York, commenced this action on August 25, 2016 alleging a violation of his constitutional rights on June 14, 2016 when he was pepper sprayed by Defendant Dion Willis.  Plaintiff, in his Pro Se complaint (5th Amended Complaint) alleges violations of his rights under the First, Fourth and Eighth Amendments.

On February 11, 2020, the law firm of Molo Lamken LLP appeared in this action as Pro Bono counsel on Plaintiff's behalf.  No application to amend the complaint was made by Pro Bono counsel.

In its simplest terms, plaintiff appears to allege the use of excessive force when he was pepper sprayed by Defendant Willis in an effort to gain plaintiff's compliance in being produced for his scheduled court appearance.

For the reasons set forth herein, Defendant Willis requests dismissal of the complaint as there has been no violation of a clearly established constitutional right; and because Willis' actions are protected by the doctrine of qualified immunity; the motion for summary judgment should be granted and the complaint (5th Amended Complaint) should be dismissed as a matter of law.

1

**STATEMENT OF FACTS**

On June 14, 2016, Plaintiff Antoine Ross was a detainee inmate at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, New York.  OBCC is a jail managed and operated by the New York City Department of Correction.

Plaintiff Ross, a gang member ("BLOODS") and a designated red card I.D. (known weapons carrier) was housed at OBCC in Housing Area 1 West, an Enhanced Supervision Housing Area (ESH).  He was assigned cell #30.  Enhanced Supervision Housing houses inmates who pose significant threats to the safety and security of staff and other inmates.  (See New York City Department of Corrections "B Form" annexed as Exhibit "D" DEF 0089).  See also, R. of N.Y.S. tit. 40, §1-16(a) annexed as Exhibit L.

On June 14, 2016, Plaintiff Ross had a scheduled court appearance in Bronx County, New York on a pending Robbery in the First Degree charge.[1]  Inmates with scheduled court appearances are awakened between 4:00 a.m. and 4:30 a.m., whereupon they are afforded an opportunity to gather their legal documents, eat breakfast and shower prior to their court appearance.  At approximately 6:00 a.m. to 6:30 a.m., staff begins the process of escorting inmates to the jail facility intake area where they are searched and then escorted onto buses and secured in preparation for their transport to their scheduled court appearance.  (Deposition

---

[1] Mr. Ross' Robbery in the First Degree charge has since been resolved and he is presently incarcerated at Auburn Correction Facility in upstate New York.

2

excerpts of Captain Monroe at 84, 90, annexed as Exhibit "E," Deposition excerpts of Chief Stukes at 49-50, annexed as Exhibit "F", and Use of Force Witness Report of Captain Monroe, annexed as Exhibit "G" DEF 0020.

On June 14, 2016, an unnamed correction officer assigned to Housing Area 1 West at OBCC, notified his immediate supervisor, Captain Latonia Monroe, that despite repeated attempts by the floor officers, they were unable to gain Inmate Antoine Ross' compliance in being produced for his scheduled court appearance that morning. (Deposition excerpts of Captain Latonia Monroe annexed as Exhibit "E" at 77).

At approximately 6:40 a.m., Captain Monroe notified the OBCC Facility Tour Commander, Assistant Deputy Warden (ADW) Sherma Dunbar, that she too, despite repeated attempts, was unable to gain Inmate Ross' compliance in being produced for his scheduled court appearance. Captain Monroe testified that Ross did not provide an explanation for his refusal, but stated "I don't want to go to court," and yelled from his cell, "no, I'm not going." As is standard procedure, Captain Monroe utilized a facility camera to record Inmate Ross' refusal to go to court.[2] (Exhibit "E" at pages 76-80).

New York City Department of Correction Operations Order 50/88 provides that force may be used to produce an inmate for court and states that "the authority that empowers the Department to use force to produce an inmate in court, is implicit in the issuance of the court order" (Securing Order).

Operations Order 50/88 further provides that:

---

[2] When an inmate refuses to go to court, that refusal is recorded on camera as proof to the Court of DOC's efforts to produce him. Captain Monroe then gave the camera to the Tour Commander to be uploaded into their computer system.

> No inmate shall be permitted to refuse a scheduled court
> appearance except in situations where there are documented
> medical reasons or documented religious reasons that would
> preclude the inmate from being present for the scheduled court
> appearance.
>
> Further, any excusal from court for medical reasons may only
> be granted by a licensed medical professional after an
> examination at the facility clinic.  (See, Exhibit "A" annexed hereto,
> DEF 0824-0825).

The Tour Commander, Assistant Deputy Warden Sherma Dunbar, activated an institutional alarm (placing the facility in alarm status) and dispatched a "probe team" to OBCC Housing Area 1 West to gain Inmate Antoine Ross' compliance in being produced for court.  Once in alarm status, all movement in the facility comes to a halt.  (Exhibit "F" at pages 254-55).

Defendant Captain Dion Willis was directed by the Tour Commander, ADW Dunbar to supervise the probe team response to Housing Area 1 West to gain Inmate Ross' compliance in being produced for court.  A probe team generally consists of two to four (2-4) officers and one (1) captain (supervisor).  When answering alarms, probe teams respond in "riot gear," i.e. helmet, protective vest, riot baton and gas mask.  Each member of the probe team is also equipped with hand held chemical agents (pepper spray).

The New York City Department of Correction is a para-military organization.  Pursuant to its rank structure, a captain's immediate superior is an Assistant Deputy Warden, in this instance ADW Dunbar (the Tour Commander).  (Exhibit "E" at 23, Exhibit "F" at 129).

At approximately 0645 hours, the probe team responded to Inmate Antoine Ross' cell (#30) in Housing Area 1 West.  Upon entering the cell, Ross was still lying in his bed.   (Deposition excerpts of Captain Dion Willis annexed as Exhibit "H" at 80-81 and Joint Statement of Stipulated Facts (hereinafter "JSSF") at No. 35).

4

Members of the probe team gave inmate Ross several direct orders to comply and get ready for his court appearance. Inmate Ross refused all orders. Members of the probe team took hold of Inmate Ross' wrist in an effort to handcuff him and escort him to the intake for court production, but each time Ross resisted and pulled away from their grasps stating "why do I have to go to court?", "what's wrong with you?" and "don't touch me bro." (Deposition excerpts of Plaintiff Ross Exhibit "I" at 183-185). Inmate Ross was advised that if he continued to refuse, he would be sprayed with chemical agents (pepper spray). Inmate Ross still refused. Ross responded, "Spray me for what"? (Exhibit "I" at pages 183-185.) (Stipulation Regarding Video Transcript (hereinafter "SRVT" at 0:56-1.23).

Inmate Ross was given a final advisement that if he did not comply with the probe team in their efforts to produce him for his court appearance, he would be sprayed with a chemical agent (pepper spray). Inmate Ross continued his non-compliance.

Captain Willis administered a hand-held one-two second burst of pepper spray (MK-9) toward Inmate Ross.[3] Probe team members then handcuffed inmate Ross and proceeded to escort him from the cell. (SRVT at 1:32-1:44).

Despite the advisements by the probe team members to inmate Ross that chemical agents (pepper spray) would be deployed if he continued his resistance, and despite inmate Ross questioning the reason why he would be sprayed; at no time prior to being sprayed did Inmate Antoine Ross inform any member of the probe team staff that he had been diagnosed with

---

[3] Chief of Security for the New York City Department of Correction Kenneth Stukes, the Department's Fed.R.Civ.P. 30(b)(6) witness testified that the purpose in using chemical agent (pepper spray) in this manner is to temporarily render inmate less resistant and less combative, and lends itself to minimizing injury to both inmate and staff. (Exhibit "F" at 252-254).

asthma.[4]   As inmate Ross was being escorted from his cell after having been sprayed, he stated to the probe team staff that he had asthma (SRVT at 1:58)  Staff are not privy to inmates' medical records or medical conditions.  (Exhibit "I" at 185 and (Exhibit "F" at 158-159).

Inmate Ross testified that the reason he failed to inform members of the probe team that he had asthma prior to being sprayed was because it "slipped my mind." (Exhibit "I" at page 185).

Antoine Ross was escorted from the cell down to a lower tier, placed on a gurney and then assisted to a shower pen, where he was able to rinse the chemical agent (pepper spray), which is water soluble, from his body.  Ross was provided with a fresh set of clothing and taken to the OBCC medical clinic to await examination by a medical professional.  (JSSF at 47, 50-56).

Antoine Ross was examined in the OBCC medical clinic by Physician's Assistant Larry Blackmore who, upon examination, made the following findings

a) Patient had no distress;

b) No O/C noted on him;[5]

c) No injury noted;

d) No treatment indicated.

(Deposition excerpts of Physician Assistant Larry Blackmore annexed as Exhibit "K" at pages 133-134; Injury to Inmate Report annexed as Exhibit "J" DEF 0121) and (JSSF at Nos. 58-59).

---

[4] Plaintiff had been diagnosed with asthma since childhood.  Inmate medical records also indicated that Antoine Ross had been pepper sprayed and exposed to pepper spray on several occasions prior.  Thus, he was familiar with the potential effects.
[5] The abbreviation "O/C" refers to the chemical agent (oleoresin capsicum) pepper spray.

Antoine Ross was determined to be fit for court and was transported to Bronx County Supreme Court for his scheduled court appearance on June 14, 2016.  (JSSF at No. 60).

New York City Department of Corrections Chemical Agents Directive No. 4510-RG governed the use of chemical agents by staff in New York City jails on June 14, 2016 (the date of this incident).

This Directive at <u>Section V.A.2 (e)</u> provided that the use of hand-held chemical agents is authorized "to enforce Department rules, facility regulations and court orders where necessary to promote the good order and safety of the facility, (see Exhibit "B").  Additionally, Operations Order 55/88  authorizes the use of force to ensure an inmate's attendance at court appearance (Exhibit "A" at pages 1 and 2) as does Directive 5006 R-C Use of Force (Exhibit "C"at pages 1 and 2, Section IV (A)(4)).

**ARGUMENT**

**POINT I**

**DEFENDANT DION WILLIS SHOULD BE GRANTED SUMMARY JUDGMENT
BECAUSE HIS CONDUCT DID NOT VIOLATE A CLEARLY ESTABLISHED
CONSTITUTIONAL RIGHT, AND ON THE GROUNDS OF QUALIFIED
IMMUNITY BECAUSE HIS ACTIONS WERE NOT OBJECTIVELY
UNREASONABLE UNDER THE CIRCUMSTANCES PRESENTED**

Summary judgment is appropriate as a matter of law where the moving party demonstrates that there exists no genuine issue of material fact to be tried. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247 (1986), Globecome Grp., LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 170 (2d Cir. 2006).

The moving party bears the burden of demonstrating that he or she is entitled to summary judgment. Huminski v. Corsones, 396F.3d 53, 69 (2d Cir. 2004).

Although the Court must view the facts in a light most favorable to the nonmoving party, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

A motion for summary judgment cannot be defeated by drawing attenuated inferences or by replying "on mere speculation as to the true nature of the facts. Knight v. U.S. Fire Inc. Co., 804 F.2d 9, 12 (2d Cir. 1986), cert. denied, 580 U.S. 932 (1987). The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. R.G. Group Inc. v. Horn and Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly

8

supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby Inc., supra. A dispute about a genuine issue exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the nonmovant's favor. Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).

Defendant Willis seeks summary judgment on the grounds that there has been no violation of a clearly established constitutional right and the grounds of qualified immunity. Defendant Willis submits that his actions were not a violation of any constitutional right, and were not unlawful. Additionally, assuming arguendo that his actions were determined to be improper, Defendant Willis is still entitled to summary judgment on qualified immunity grounds, unless a reasonable officer under the circumstances presented would understand that such actions violate a clearly established right and were unlawful. Thus, an officer who is mistaken as to what the law requires is entitled to qualified immunity as long as his mistaken belief was not objectively unreasonable given the particular facts and circumstances. Analysis must be based upon what he knew at the time and not judged under the benefit of 20/20 hindsight. Anderson v. Creighton, 483 U.S. 635 (1987), Saucier v. Katz, 533 U.S. 194 (2001).

There is no dispute that on June 14, 2016, Plaintiff Antoine Ross, a detainee inmate in an Enhanced Supervision Housing area, had a scheduled court appearance, nor is there any dispute that Plaintiff refused numerous attempts by several different staff members to comply with their orders to follow the procedures necessary in order to produce him for his scheduled court appearance.

There is no issue that after warning Plaintiff that if he continued to refuse and resist that he would be pepper sprayed, and there is no dispute that when he did not comply, one-two

second burst of chemical agent (pepper spray) was deployed, plaintiff was handcuffed, escorted to a decontamination shower pen to wash off the water soluble pepper spray (Exhibit "F" at 221). It is also undisputed that Plaintiff was provided with fresh clothing, examined at the facility medical clinic by a medical professional, found to have no injury, in no distress and in need of no treatment. Plaintiff was found fit for court and transported to his scheduled court appearance.

The U.S. Supreme Court in <u>Kingsley v. Hendrickson</u>, 576 U.S. 389 (2015) held that under 42 U.S.C. §1983, a pre-trial detainee, in order to prevail on an excessive force claim, must demonstrate that the force purposely and knowingly used against him was objectively unreasonable.

The Court noted that this objective reasonableness turns on the facts and circumstances of each particular case (<u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)). A court should make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." <u>Bell v. Wolfish</u>, 441 U.S. 520, 540, 547 (1979).

The Court listed considerations which may bear on the reasonableness or unreasonableness of the force used, but noted that the list was not exclusive. Considerations listed by the Court included:

a) the relationship between the need for the use of force and the amount of force used;

b) the extent of the plaintiff's injury;

10

c) any effort made by the officer to temper or to limit the amount of force;

d) the severity of the security problem at issue;

e) the threat reasonably perceived by the officer; and

f) whether the plaintiff was actively resisting.

The court noted further that in <u>Bell</u>, in the absence of an expressed intent to punish, a pre-trial trainee can nevertheless prevail by showing that the actions are not "rationally related to a legitimate non-punitive governmental purpose" or that the actions appear excessive in relation to that purpose." Id., at 561.

The court determined that the use of an objective standard adequately protects an officer who acts in good faith.  A court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer.

Finally, the court noted that an officer enjoys qualified immunity and is not liable for excessive force unless he has violated a "clearly established" right, such that "it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confront." <u>Saucier v. Katz</u>, <u>supra</u>.

In the instant matter, Plaintiff appears to premise liability upon Defendant Willis' neglect in failing to inform his superior ADW Dunbar that the alarm activation by her was an error, and that an extraction team rather than a probe team should have been assembled and the matter deemed an "anticipated" use of force event which would have triggered extraction protocols.

Plaintiff suggests that had this been done; the medical clinic could have been consulted and it determined whether Plaintiff was contraindicated for the use of chemical agents (pepper spray) and/or an electronic immobilization shield.  However, these are procedures which should

11

have been initiated by the Tour Commander.  The City's Fed. R. Civ. P. 30(b)(6) witness, Chief Kenneth Stukes, acknowledged that under DOC practices and policy this was not a probe team scenario, and thus should not have ordered a probe team response.  Rather, the Tour Commander should have ordered the assembly of an extraction team with accompanying protocols (Exhibit F at 257-258).

The court, in Rizk v. City of New York, No. 14-CV-6434 (RRM)(RER) 2020 U.S. Dist. LEXIS 90918 at *28-*29 (E.D.N.Y. May 22, 2020), noted that "Section 1983 does not provide a remedy for best police practices" and [a]ccordingly an act or omission that violates police policy but does not also violate constitutional rights is not actionable under §1983.  See, also Bah v. City of New York, 319 F.Supp. 698 (50 NY 2018) (fatal police shooting of an emotionally disturbed person armed with a knife where police elected to not use a y-bar, a long bar designed to contain such a person, and police did not wait for the arrival of a hostage negotiating team.)

Defendant Willis submits that assuming arguendo for the purpose of this motion that Plaintiff is correct, such rule infraction by Defendant Willis may perhaps subject him to employee discipline, but does not establish that Defendant Willis' conduct was "unlawful," much less establish that any reasonable officer would clearly determine such conduct to be unlawful.  See, Ismael v. Charles, No. 18-cv-3957 (GHW) 2020 U.S. Dist. LEXIS 124292, at *28-*30 (S.D.N.Y. July 15, 2020) (holding that "it is not clearly established that pepper spraying an uncooperative inmate is unlawful").

Plaintiff had refused numerous attempts by the floor officer to gain his compliance in attending his scheduled court appearance.  Plaintiff had also rebuffed several attempts by Captain Monroe, the housing area supervisor, to comply.  Plaintiff's non-compliance was

recorded on camera by Captain Monroe who indicated that Plaintiff appeared fine, but stated he just said that he "didn't want to go to court."  (Exhibit "E" at 77).

It should have been readily apparent to the Tour Commander, ADW Dunbar that this was an anticipated use of force scenario when she activated the institutional alarm and dispatched a probe team rather than assembling an extraction team.[6]  This was confirmed by Chief Kenneth Stukes, the 30(b)(6) witness, during his deposition (Exhibit "F" at 257-258).  Despite the error by the Tour Commander in dispatching the probe team, Defendant Willis submits that his actions, once there, were not objectively unreasonable under the circumstances presented.

Applying considerations listed by the court in Bell, and others, the following can be stated:

a) the relationship between the need for the use of force and the amount of force used.

Defendant Willis and his team (probe team) sought to gain Inmate Ross' compliance in attending his scheduled court appearance.  The Department of Correction (DOC) is required to ensure that Ross attend his court appearances and recognizes that force will be necessary to accomplish this in certain situations (see Exhibits "A", "B" and C).  Moreover, the amount of force used, i.e. chemical agents (pepper spray) to accomplish this objective is recognized as the least amount of force under the DOC use of force continuum.  (See Exhibit "C" at pages 5-6).

b) the extent of Plaintiff's injury.

The best assessment as to the level of the injury, if any, sustained by Plaintiff, can be found in the medical clinic's notes concerning Plaintiff's examination the day of the incident.

---

[6] It merits noting that had an extraction team been equally unsuccessful in gaining Plaintiff's voluntary compliance as had been the three (3) prior efforts (floor officer, Captain Monroe and probe team), the protocol would have been for an extraction team in full riot gear, to enter the cell, "shock" Plaintiff with an electronic immobilization shield unless contraindicated for that as well, and physically and forcefully remove Plaintiff from the cell.  (Exhibit "E" at 48).

Upon examining Antoine Ross, Physician's Assistant Larry Blackmore noted:  Patient had no distress, no o/c noted on him, no injury noted, no treatment indicated.  Simply stated, Plaintiff sustained no injury.  The Court, in Saucier, supra, at 209, noted the lack of injury in that matter confirmed their finding that the force used was not excessive.

Additional criteria listed by the Court in Bell, supra included any effort made by the officer to temper or to limit the amount of force, the severity of the severity of the security problem at issue, the threat reasonably perceived by the officer and  whether the Plaintiff was actually resisting.

In addition to the efforts of the housing area floor officer, and the efforts of the housing area supervisor, Captain Latonia Monroe, Defendant Willis, as well as other members of the probe team, attempted to convince Inmate Ross to simply comply and prepare for court, but Ross refused.  Officers attempted to handcuff Ross, but Inmate Ross pulled away from their grip stating inter alia, "don't touch me bro."  Inmate Ross was warned that if he did not comply, that chemical agents (pepper spray) would be used.  Ross responded, "spray me for what" and "y'all niggas is crazy son.  Y'all niggas is crazy."  When Inmate Ross did not comply, he was sprayed, handcuffed and removed from the cell to begin the decontamination process.

Chief Kenneth Stukes, the City of New York's F.R.C.P. 30(b)(6) witness, explained that chemical agents (pepper spray) are deployed in such situations to eliminate and/or lessen the need to physically engage the inmate.  Chief Stukes explained that it is safer to handcuff an inmate by temporarily incapacitating him.  Chief Stukes noted that this promotes the safety of both staff and inmate by limiting or eliminating the need to utilize physical force to apply handcuffs. (Exhibit "F" at 252-254).

Inmate Ross was refusing to attend his scheduled court appearance.  The Department of Correction is obligated to produce him for court.  It is a mandate embodied in the securing order. (See Exhibit "A").

Staff was authorized to utilize force (including chemical agents) to enforce the rules and regulations of the agency and to enforce court orders.  (See Exhibit "A", Exhibit "B", and Exhibit "C", herein).

The efforts to produce Antoine Ross for his court appearance had begun at 4:30 - 5:00 a.m., with attempts by the floor officers.  It continued with the housing area supervisor, Captain Latonia Monroe.

Chief Stukes explained that DOC policy and understanding is that inmates are produced for court by 9 a.m.  Chief Stukes further explained that while an inmate's non-compliance may not present urgency at 5 a.m., it may eventually constitute an emergency situation as it neared 7 a.m., a time which may increase the risk of missing the Department's 9 a.m. goal for producing an inmate at the courthouse.  (Exhibit "F" at 65-67).

The probe team was ordered to respond, despite Chief Stukes' assessment that this was not a probe team response scenario.  The probe team operates under the direction of the Tour Commander (Exhibit "F" at 130).  Captain Willis and his team responded as ordered by the Tour Commander, ADW Dunbar, and sought to gain Ross' compliance.  Staff was able to enter the cell and speak to Inmate Ross.

The probe team members attempted to convince Ross to voluntarily comply, but he refused.  Probe team members attempted to handcuff Ross, but he resisted and pulled away from their grip.  Staff warned inmate Ross that chemical agents would be used, but Ross

15

continued his non-compliance. The probe team had responded to Housing Area 1 West, an Enhanced Supervision Housing Area, specifically designed to house inmates who pose significant threats to the safety and security of staff and other inmates (Exhibit "L").

It is clear that Inmate Ross, an Enhanced Supervision Housing (ESH) inmate, refused court and presented safety and security problems and heightened risk to staff.

Counsel for plaintiff may point to a deposition response of Captain Willis' wherein he stated that he did not feel threatened. However, this would ignore the counterbalanced deposition testimony by Captain Willis wherein he testified that "I view all inmates as threats." "When I respond to an area as an alarm supervisor, yes, every inmate to me is a threat." (Exhibit "H" at 85). Certainly, when the area in question is Enhanced Supervision Housing, the threat level is heightened.

Immediately upon Ross being sprayed, staff was able to handcuff him without physical confrontation. Thus, the need for further force was eliminated. Ross was then escorted from the contaminated cell and staff began escorting him to the intake area to a shower. When en-route, Ross claimed he could no longer walk, and staff arranged to transport him by gurney. Upon arrival to the shower area, staff carried Ross to the shower area where he was able to rinse the water soluble chemical agents. Thereafter, Ross was given a fresh set of clothing and presented to the medical clinic, found fit for court and transported to his court appearance.

It merits noting that staff is not privy to an inmate's medical condition. (Exhibit "F" at 158-159). Moreover, Inmate Ross, despite having been exposed to chemical agents (pepper spray) on prior occasions, did not inform Captain Willis or any member of the probe team, prior to being sprayed, that he had been diagnosed with asthma. This, despite staff warning him

16

several times that chemical agents would be deployed if he continued his non-compliance. Ross' comment in this regard was "spray me for what," thus indicating a clear understanding of the warnings given by Captain Willis and other members of the probe team.  It was only after being sprayed that Inmate Ross stated that he had asthma.

The Supreme Court, in <u>Anderson v. Creighton</u>, <u>supra</u>, held that an officer would be entitled to summary judgment if he could demonstrate as a matter of law that a reasonable officer could have believed that a warrantless search of Plaintiff Creighton's home comported with the requirements of the Fourth Amendment, even though it actually did not.  The Court reasoned that an officer was entitled to qualified immunity even if mistaken as to whether probable cause existed, provided his mistake was objectively reasonable under the circumstances presented, in light of clearly established law and the information possessed by the searching officers.

The Court, in <u>Saucier</u>, <u>supra</u>, held that the reasoning in <u>Anderson</u>, <u>supra</u>, in addressing the probable cause search cases applied equally to claims alleging excessive force, <u>Saucier</u>, at 204-206.

<u>Saucier</u> involved a claim of excessive force during the arrest of a protester at an army base where then Vice-President Gore was delivering a speech.  The plaintiff, Katz, in <u>Saucier</u>, alleged that he was grabbed from behind by two officers half- walking and half-dragging him, with his feet "barely touching" the ground.  Katz claimed that he was wearing a visible knee-high leg brace and was taken to a nearby van where he was then "shoved" or "thrown" inside.

The Court confirmed that in addressing qualified immunity, a two-part analysis is required.  Initially, a court must determine whether a constitutional right was violated.  If no

17

constitutional right was violated, even if the allegations are established, there is no necessity for further inquiries concerning qualified immunity.  However, if a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established.  The Court stated, "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable" at 201.

The Court further noted that Graham v. Connor, supra, "clearly establishes the general proposition that a use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness."  The Court continued that analysis does not stop there. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  See Wilson v. Lane, 526 U.S. 603, 615 (1999).  The right alleged to have been violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.  Anderson v. Creighton, supra.  See, Ismael v. Charles, supra, wherein the Court held that "it is not clearly established that pepper spraying an uncooperative inmate is unlawful."  In the instant matter, Plaintiff Ross, an ESH inmate, was not only uncooperative, but physically resisted staff's attempts to handcuff him and produce him for Court.

In seeking to lend further emphasis, the Saucier Court noted its holding in Graham, supra, that "the reasonableness of an officer's belief as to the appropriate level of force should be judged from an on-scene perspective."  The Court cautioned against the use of the 20/20 vision of hindsight in deference to the judgment of reasonable officers on the scene.

18

Qualified immunity operates to protect officers from the sometimes hazy border between excessive and acceptable force.  An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If an officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense, <u>Saucier</u> at 205-206.

Defendant Willis submits that his actions were objectively reasonable under the circumstances presented.  He was ordered to lead a probe team to address inmate Ross' numerous refusals to comply with his production for court.  It merits noting that an investigation conducted at the OBCC facility level by Captain Reginald Stukes determined the force herein to be necessary and unavoidable.  This finding was concurred with by the Tour Commander, the Deputy Warden of Security and the Warden of the facility, all of whom determined that Captain Willis' actions were appropriate, and thus it is submitted not objectionally unreasonable.  (See Investigating Supervisor's Report and Concurrences annexed as Exhibit "M").

Chief Kenneth Stukes, the Fed. R. Civ. P. 36(b)(6) witness for the City of New York, testified that this was already an anticipated use of force scenario and not a situation to which a probe team should have been order to respond.  The Tour Commander should have had an extraction team assembled.  Chief Stukes explained that an extraction is used when time is not an issue and the Department has time to plan for the extraction.  However, time was an issue since Chief Stokes explained that extractions may take hours.  Yet, Inmate Ross was by 7 a.m. already in jeopardy of being late for court.  Captain Willis was thus ordered as a probe team to respond to what was actually neither a probe team response nor an extraction scenario.  Not a probe team

scenario because the force was anticipated, and not an extraction scenario because time was an issue.

Upon arrival of the probe team, the door to Inmate Ross' cell was opened, the probe team entered and attempted to gain his compliance. Members of the probe team attempted to handcuff Inmate Ross, but each time he resisted and pulled away.

New York City Department of Corrections Operations Order #50/88 (Exhibit "A"), Chemical Agent Directive #4510-RG (Exhibit "B") and Use of Force Directive #5006-RC, all authorize the use of force to produce an inmate for court and the chemical agents directive specifically authorizes the use of chemical agents (pepper spray) to achieve such an objective.

Given such a scenario where Chief Stukes indicated that the Tour Commander's decision in determining this to be a probe team response situation and the sounding of an institutional alarm was in error, and given the operations order and directions authorizing force to produce an inmate for court, including the use of chemical agents, the actions of Defendant Captain Dion Willis were taken in good faith and were objectively reasonable even if later determined to be mistaken. It is submitted that this is precisely the type of conduct qualified immunity was designed to protect.

Moreover, and of most importance, the alleged failure to follow an anticipated force provision, even if true, constitutes an administrative Department of Correction violation and not a clearly established constitutional right which is actionable. See, Rizk v. City of New York, supra, and Bah v. City of New York, supra.

Defendant Willis submits the Plaintiff has failed to establish that a clearly established constitutional right was violated. Moreover, the actions of Defendant Willis, under the

circumstances presented, were not objectively unreasonable.  The force utilized was minimal, resulting in no injury, and was administered in good faith for the sole purpose of producing Inmate Ross for his scheduled court appearance after numerous attempts to gain his compliance had failed.   Moreover, following the use of pepper spray, Inmate Ross was immediately decontaminated, taken to a shower to remove the pepper spray, and thereafter taken to the medical clinic.

The neglect, if any, by Defendant Willis in failing to follow Department anticipated use of force protocols, while it may be contrary to DOC best correction practices, does not rise to the level of denial of a fundamental right, and was not unlawful.  Additionally, Defendant Willis for the reasons stated herein, is protected by the doctrine of qualified immunity.  Defendant Willis' motion for summary judgment should be granted and the complaint dismissed.

## POINT II

### DEFENDANT WILLIS WAS NOT DELIBERATELY INDIFFERENT TO PLAINTIFF'S MEDICAL NEEDS.  MOREOVER, THIS CLAIM WAS NOT PLED AND PURSUIT OF SUCH A CLAIM IS THEREFORE INAPPROPRIATE

Deliberate indifference in this context requires more than mere negligence.  Deliberate indifference requires a subjective recklessness.   A person must "consciously disregard a substantial risk of serious harm and fail to take reasonable measures to abate it."  Farmer v. Brennan, 511 U.S. 825 (1994).

Plaintiff's 5th Amended Complaint under "Legal basis for claim" appears to allege violations of his 1st, 4th and 8th Amendment rights in that "a review on the Plaintiff medical

records showed on 1/29/16 he was diagnosed with asthma with acute exacerbation by Dr. Guilbaut."

In the section of the 5th Amended Complaint under the heading of punitive damages, plaintiff alleges that, "plaintiff was sprayed with MK-9 a chemical agent that triggered off medical problem which can cause trauma or death."

As this Court noted in granting the motion to dismiss against Defendant City of New York, "it is well established that the submissions of a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (internal question marks and citation omitted). "Nonetheless, a pro se complaint must state a plausible claim for relief." Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014).

The complaint fails to articulate a plausible claim of deliberate indifference to medical needs. Moreover, Plaintiff is no longer pro se, but rather has had able counsel since February 11, 2020. Counsel has not sought to amend the complaint concerning a deliberate indifference to medical needs claim, arguably recognizing that no such claim exists under the facts and circumstances of this action.

Even if plaintiff's claims are read as an unstated 14th Amendment claim, and even if the presence of counsel since February 11, 2020 is ignored and Plaintiff's complaint is liberally construed to accommodate his pro se status, no claim for deliberate indifference to medical needs can be inferred.

The essence of plaintiff's allegations, even if liberally accepted, suggest that spraying him with a chemical agent (pepper spray) was actionable because he had previously been diagnosed with asthma.

Nowhere in the complaint is it alleged that Defendant Willis was aware of Plaintiff's asthma diagnosis. In fact, the evidence adduced during discovery is that Defendants are not privy to inmate medical records and medical conditions. (Exhibit "F" at 158-159).

Perhaps had Plaintiff informed Defendants of his asthma diagnosis after being warned that chemical agents (pepper spray) would be deployed if plaintiff persisted in his no compliance, he might then at least claim that he was sprayed despite informing staff of his asthma diagnosis. However, that is simply not the case here.

There is no evidence that Defendant Willis or any Defendant was aware of Plaintiff's asthma diagnosis. Defendants became aware for the first time when plaintiff stated he had asthma after he had been sprayed (underline added).

Moreover, upon having sprayed Plaintiff, he was immediately handcuffed and removed from the area of his cell, which is the first step in the decontamination process. Thereafter, Plaintiff was escorted from the area. When Plaintiff claimed he could not walk, a gurney was provided and he was wheeled to the intake shower pen area where he was carried down a short set of stairs, placed in a shower pen and his handcuffs (flexcuffs) were removed. (JSSF at Nos. 49-51 and 54-56).

After washing off the water soluble pepper spray (MK-9), Plaintiff was provided with a fresh set of clothes and then immediately logged into the facility clinic to be seen. Once in the

clinic, Plaintiff was triaged by medical staff and seen in accordance with his needs. (Exhibit "K" at 133-134).

Plaintiff was examined by Physician's Assistant Larry Blackmore who noted, "patient in no distress, no o/c noted on him, no injury noted, no treatment indicated." The initials o/c refer to oleoresin capsicum, the component in the chemical agent (pepper spray). (Exhibit "K" at pages 75 and 133-134, and Injury to Inmate Report annexed as Exhibit "J").

Plaintiff, in his Fourth Amended Complaint, alleged that he was "sprayed in the face with MK-9 chemical agent by a probe team, in an effort to produce him to (sic) a court appearance" (ECF #40). Thus, there can be no suggestion that Plaintiff was sprayed for any reason other than this purpose.

There was no evidence of indifference to Plaintiff's medical needs. Defendants took all necessary steps to ensure his presence at the clinic to be examined and treated, if necessary. Moreover, a deliberate indifference to medical needs claim has not been articulated, even under liberal pro se standards, and summary judgment should be granted.

**CONCLUSION**

**PLAINTIFF HAS FAILED TO DEMONSTRATE THAT THE ALLEGATIONS ALLEGED IN THE COMPLAINT, IF TRUE, VIOLATE A CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT.  ALTERNATIVELY, THE ACTIONS OF DEFENDANT WILLIS WERE NEITHER OBJECTIVELY UNREASONABLE NOR RECKLESS.  THEREFORE, HE IS ENTITLED TO QUALIFIED IMMUNITY, AND SHOULD BE GRANTED SUMMARY JUDGMENT.**

Dated:  Mineola, New York
       December 21, 2020

                     Respectfully submitted,

                     FRANKIE & GENTILE, P.C.

                     *James G. Frankie*

                     James G. Frankie, Esq.
                     *Attorney for Defendant Willis*
                     1527 Franklin Avenue
                     Mineola, New York  11501