# EXHIBIT I

KBNQrosC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

ANTOINE ROSS,

                    Plaintiff,

          v.                              16 Civ. 6704 (PAE)
                                          REMOTE TELECONFERENCE
NEW YORK CITY, SADOC GENOVES,
ROCHAURD GEORGE, et al.,,

                    Defendants.

-------------------------------x
                                          New York, N.Y.
                                          November 23, 2020
                                          3:00 p.m.

Before:

                    HON. PAUL A. ENGELMAYER,

                                          District Judge

                              APPEARANCES

MoloLAMKEN LLP
     Attorneys for Plaintiff
BY:  JUSTIN M. ELLIS
     SARA E. MARGOLIS
     LAUREN F. DAYTON

NEW YORK CITY LAW DEPARTMENT
     Attorneys for Defendants NYC, GENOVES, GEORGE
BY:  JOSHUA A. WEINER

FRANKIE & GENTILE PC
     Attorney for Defendant Willis
BY:  JAMES G. FRANKIE


ALSO PRESENT:  AARON DAVISON (NYC LAW DEPT.)

KBNQrosC

```
 1              (The Court and all parties appearing telephonically)

 2              THE COURT:  Good afternoon.  This is Judge Engelmayer.

 3    Let me begin by confirming with my law clerk that all counsel

 4    are on the line.

 5              (Replies)

 6              THE COURT:  Is the court reporter on the line as well?

 7              (Replies)

 8              THE COURT:  Good afternoon, Ms. Lynch.  And thank you

 9    for your services.

10              Let me begin by taking the roll.

11              So, for the plaintiff, Antoine Ross, do I have

12    Mr. Ellis, Justin Ellis, on the line?

13              MR. ELLIS:  Yes.  Good afternoon, your Honor.

14              THE COURT:  Good afternoon.

15              Do I have Sara E. Margolis on the line?

16              MS. MARGOLIS:  Yes, your Honor.  Good afternoon.

17              THE COURT:  Good afternoon.

18              And Lauren F. Dayton.

19              MS. DAYTON:  Yes, your Honor.  Good afternoon.

20              THE COURT:  Good afternoon.

21              And thank all three of you for representing the

22    plaintiff pro bono.

23              And for defendants Genoves and George, do I have

24    Joshua Weiner on the line?

25              MR. WEINER:  Yes, your Honor.  Good afternoon.
```

KBNQrosC

1          THE COURT:  Good afternoon.

2          Do I have Aaron Davison on the line?

3          MR. DAVISON:  Yes, your Honor.  Good afternoon.

4          THE COURT:  And for defendant John Willis, is James

5     Frankie on the line?

6          MR. FRANKIE:  Yes, your Honor.  Good afternoon.

7          THE COURT:  I will note that the City of New York is

8     represented by the same counsel who represents defendants

9     Genoves and George.

10          This is our case management conference following the

11     close of discovery, and in light of the premotion letters

12     indicating an intent to file motions for summary judgment by, I

13     think both sets of defendants, I will use the conference to

14     explore a little bit the anticipated summary judgment motions

15     and to set a schedule which will be prompt for the briefing of

16     such motions.  I also have some thoughts about the means of

17     presenting the facts to me, which hopefully will result in it

18     being done in a clean, efficient way.

19          Let me begin though with -- before I ask the

20     defendants about the nature of their motions, who will be

21     speaking for plaintiff?

22          MR. ELLIS:  Your Honor, this is Justin Ellis.  Lauren

23     Dayton will be speaking.

24          THE COURT:  Thank you.

25          Ms. Dayton, here is the principal question I have.

KBNQrosC

1          In each of the response letters you have to the two

2    sets of motions, there is a statement in the footnote that says

3    you're only proposing to move against some of our pending

4    claims, but the footnote doesn't state what the other claims

5    are that you believe are still alive in the case that

6    defendants haven't indicated an intent to move against.  I was

7    having difficulty figuring out what they could be.

8          So, Ms. Dayton, let's begin with Mr. Willis.  What

9    claims do you believe are still in the case brought by

10   Mr. Willis?  I recognize it's challenging here because we've

11   had a series of pro se complaints, and those present some

12   interpretative challenges.  Nonetheless, through discovery, I

13   was a little bit alarmed at what might be some confusion among

14   the parties as to what claims are in the case.  So please tell

15   me beginning with just the Willis complaint, the claims against

16   Willis.

17          MS. DAYTON:  Certainly, your Honor.  The question is

18   which claims do we believe he is not moving for summary

19   judgment?

20          THE COURT:  No.  I want to know just what claims you

21   think are in the case.  It may be that the problem here is you

22   think there are more claims in the case than the defendants

23   think.  I fully expect that by the end of this conversation,

24   the defendants are likely to tell me if in fact you identify a

25   claim that they haven't specifically addressed in their letter

KBNQrosC

1    that they would have intended to signal intent to move against

2    that too; they just hadn't been aware the claim was in the

3    case.

4          Since your footnote didn't spell out the other claims,

5    just give me a list for the claims you've still got against

6    Willis.

7          MS. DAYTON:  Certainly, your Honor.

8          So, against Captain Willis, we believe we've got a

9    Fourteenth Amendment claim for excessive force and deliberate

10   indifference.

11         THE COURT:  Anything else?

12         MS. DAYTON:  No, your Honor.

13         THE COURT:  I mean, I understood the defense motion to

14   explicitly or, rather, premotion letter to explicitly take

15   issue with excessive force.  I read it as well to anticipate a

16   motion for summary judgment as to deliberate indifference.

17         Just briefly yes or no, Mr. Frankie, is it your

18   intention to move for summary judgment as against both claims

19   or just one of those?

20         MR. FRANKIE:  Well, it would be with respect to both,

21   but to be honest, your Honor, I don't see a claim for

22   deliberate indifference to medical needs in the complaint.

23         THE COURT:  Let's pause on that.  We will get back to

24   that in a moment.  Just put a flag on that.

25         Let's just go back then to the other set of

KBNQrosC

```
 1   defendants, now the Genoves and George.  Ms. Dayton, what are
 2   the claims that you believe are still in the case as to the
 3   Genoves and George defendants.
 4            MR. ELLIS:  So, the same claims for excessive force
 5   and deliberate indifference under a participant liability
 6   theory, and then failure to intervene to prevent Captain
 7   Willis's excessive force and deliberate indifference.
 8            THE COURT:  All right.  I had read clearly the defense
 9   to be contending -- to be moving for summary judgment on the
10   failure to intervene.
11            Let me ask who will be taking the lead for Genoves and
12   George?
13            MR. DAVISON:  Mr. Davison, your Honor.
14            THE COURT:  Mr. Davison, did you understand those both
15   to be claims, for better or worse -- I understand that you
16   challenge the merits of the claims and all -- but did you
17   understand both of those claims to be live in the case as
18   against your clients?
19            MR. DAVISON:  No, your Honor.  Defendants Genoves and
20   George only believe the failure to intervene claims to be alive
21   in this case.
22            THE COURT:  Not the claims that they were actually
23   participants.
24            MR. DAVISON:  Yes, your Honor.
25            THE COURT:  May I ask you though, sticking with you,
```

KBNQrosC

Mr. Davison, look, having not studied the complaints with a close eye to figuring out whether each of the claims Ms. Dayton has identified are in fact fairly discerned in the pro se -- the most recent version of the pro se complaint, let us assume for argument's sake that the complaints literally read in light of the pro se authorship are taken to allege participation.  I take it for similar reasons - not identical, but similar reasons - that you would be moving for summary judgment on a failure to intervene, you would be arguing that the act or omissions or whatever the plaintiff contends constituted participation, you would be presumably intending to move for summary judgment on that too?

MR. DAVISON:  Yes, your Honor, that's correct.

THE COURT:  And similarly for you, Mr. Frankie, putting aside your dispute about whether the deliberate indifference to medical needs are in the case, assuming that I was to conclude based on a generous reading of the pro se complaint that it was pled, I take it you would also be moving for summary judgment on that ground, on the grounds that from your perspective the evidence falls short of permitting a jury finding on at least one element of that claim.

MR. FRANKIE:  Yes, your Honor, and the --

THE COURT:  All right.  The reason I'm going here is I want to make sure we start off this process on sort of agreement on what the, you know, issues are.  Ms. Dayton has

KBNQrosC

helpfully broken out -- it's not as expansive as I feared

because I know originally there was something like a First

Amendment claim and a Fourth Amendment claim that I think the

pro se plaintiff articulated, I'm heartened to know that there

is no attempt to revive those, but Ms. Dayton has identified

the couple of claims as to each party.

I think the best way to do this is as follows:  I'm

not on this call going to referee a dispute about the proper

reading of the complaint.  So, defense counsel, you are on

notice that the plaintiff perceives there to be an effective

pair of live claims for each set of defendants:  For Willis,

Fourteenth Amendment, excessive force and deliberate

indifference with respect to medical needs, and for the Genoves

and George defendants theories of both participation and

failure to intervene in connection with excessive force.

Defense counsel in moving for summary judgment, you

are at liberty to proceed in one of two ways as to the claim

that you state you had been unaware the plaintiff was still

pursuing.  You're obviously at liberty to argue that there

simply was not sufficient evidence adduced in discovery to

support that claim, a traditional summary judgment argument,

but I am fine as well, in addition, arguing that even before we

get to an evidentiary issue, the pro se complaint is not

properly read to support such a claim or that the intervening

litigation by counsel clearly took that off the table or can

KBNQrosC

only be read to imply counsel's view that there was no such

claim in the case.  You're at liberty to include arguments

along those lines.

I expect at the end of the day I'm principally going

to be focused on what the evidence supports because as to both

of the disputed claims here -- deliberate indifference to

medical needs for Willis and participation as to Genoves and

George -- they are so, you know, closely tied to the well-pled

claim for Willis for excessive force and for Genoves and George

for failure to intervene that there's a decent chance I'm not

going to block the claim from reaching summary judgment.  I

will largely, I expect, be focused on whether or not the

evidence permits it to clear summary judgment.

So, in any event, defense counsel, just so we don't

have an issue at the end of briefing of your having failed to

engage with the claim, now we know what the full spectrum is.

OK, Mr. Frankie, understood?

MR. FRANKIE:  I believe so, your Honor.

THE COURT:  And, Mr. Davison, understood?

MR. DAVISON:  Yes, your Honor.

THE COURT:  OK.  So next question, now focusing on

defense counsel, let me -- and I think this question is

probably better put to Mr. Davison.  I was intrigued from the

letters just to understand that there's a video here, and it

strikes me that the video may be important for -- is likely to

KBNQrosC

| | |
|---|---|
| 1 | be important for everybody's claims, it may be especially |
| 2 | important in assessing the failure to intervene claims insofar |
| 3 | as if the video is reasonably complete, it may very |
| 4 | substantially provide the relevant factual basis for judging |
| 5 | the arguments that Genoves and George are making about no duty |
| 6 | to intervene, no time to intervene, all those sorts of things. |
| 7 | So, Mr. Davison, tell me about the video, does it |
| 8 | capture all events from start to finish. |
| 9 | MR. DAVISON:  Your Honor, it does not capture the |
| 10 | events visually; it does capture the events audibly. |
| 11 | THE COURT:  Ahh, that's very important.  I thought it |
| 12 | was described as a video.  What is shown on video? |
| 13 | MR. DAVISON:  So, the camera operator is stationed |
| 14 | around the entryway of the cell and cannot really see into the |
| 15 | cell where both plaintiff and the three defendants in this case |
| 16 | are.  And that's pretty much where it stays until after the |
| 17 | Capsicum is sprayed, and then he's handcuffed and taken out of |
| 18 | the cell.  And then from there on, you can see what happens |
| 19 | when he is taken out of the cell and taken to the intake area. |
| 20 | THE COURT:  But, in other words, at the critical |
| 21 | moment when he is sprayed, is that caught on video? |
| 22 | MR. DAVISON:  Visually it is not caught on video, but |
| 23 | you can hear when it happens. |
| 24 | THE COURT:  How can you -- I mean, if a person was |
| 25 | trying to time the length of the spraying, would you be able to |

KBNQrosC

```
 1    from the audio?

 2              MR. DAVISON:  Yes, your Honor.

 3              THE COURT:  Is it that loud?  Is it obvious when it's

 4    on and off?

 5              MR. DAVISON:  Yes, your Honor.  Defendants contend

 6    that it is obvious when it's on and off, and, indeed, plaintiff

 7    testified that he could hear when the spray happened, and that

 8    it was short.

 9              THE COURT:  No, I understood in his testimony that

10    it's short; I'm just trying to understand if one didn't get

11    into the testimony and just used the video as, you know,

12    objectively accurate as to what it indisputably shows, I'm

13    trying to figure out what it shows.  Is this a hand-held or is

14    a stationary-like security camera?

15              MR. DAVISON:  Hand-held.

16              THE COURT:  What occasions the video to be made,

17    Mr. Davison?

18              MR. DAVISON:  So, whenever a probe team is called to

19    an incident which was happening here, a probe team was called,

20    one of the members of the probe team has to have a camera and

21    must film the incident as it's happening.  So that was the

22    reason why.

23              THE COURT:  I see.  That's interesting.  Is that a

24    requirement of relatively recent vintage like the body cameras

25    or does that go back some time?
```

KBNQrosC

1          MR. DAVISON:  I believe it goes back some time, and it

2     is included in the DOC policy.

3          THE COURT:  Got it.  And so the reason the camera

4     doesn't capture the key events is just that the spatial

5     relations didn't permit the camera to be in a useful place.

6     How come the camera essentially misses the key activity here?

7          MR. DAVISON:  Yes.  So, the way it starts is that, you

8     know, so there are five probe team officers.  Captain Willis

9     goes in first, followed by George and Genoves.  And so, you

10    know, they're in the cell with plaintiff, and then another

11    officer, who is a non-party here, Officer Jordan, is stationed

12    kind of in the entryway, and the camera operator, being the

13    last person, was just behind him.  And so for whatever reason,

14    she didn't move up to go into the cell to look, to station the

15    camera so they could see.  She stayed there the entire time.

16         THE COURT:  If I were trying to imagine the events

17    from your clients' plural perspective, the audio sounds like it

18    captures -- we know that they're in the room, and it captures

19    the start-and-end moment.  Does it situate where your two

20    clients are relative to Willis and relative to Ross?

21         MR. DAVISON:  It does somewhat.  I think it does in

22    the beginning because you can see how they each enter.  As I

23    said before, it was Willis first and then -- I can't remember

24    the actual, you know, whether it was Genoves or George first,

25    but you can see each of them go in after one another so you can

KBNQrosC

1    kind of go off of that, but afterwards I guess you can't really

2    say where they are in the cell except that they went in after a

3    certain person.

4              THE COURT:  Got it.  So, among the issues to be

5    litigated here involves the failure to intervene, which implies

6    some notice that in effect a constitutional violation either

7    was under way or was clearly about to happen.

8              One concern I have, particularly with the patchy

9    video, is that the audio may be less than crystal clear as to

10   the words that are being articulated or, for that matter, by

11   whom.  Have the parties per chance created a transcript or

12   something that everyone agrees reflects, you know, in sequence

13   what words were said by whom?

14             MR. DAVISON:  We have not done that.  However, we can

15   do that.  We're fine with doing that, because we believe that

16   you're able to hear who is saying what and, you know, and

17   what's being said.

18             THE COURT:  All right.  Then let me pause on that and

19   make the following proposal.  In a few minutes when I get to

20   next steps, I'm going to set as our first date before anyone's

21   first brief is due a deadline for a submission of what I call a

22   joint set of stipulated facts, or a JSF, in which you negotiate

23   to put together a comprehensive list of all facts that

24   everybody agrees are undisputed.

25             I would like immediately, and I will ask the defense

KBNQrosC

1    to take the lead on this, for you to create, you know, what you

2    believe to be a neutral transcript of the words used on the

3    video or at least the parts of the video that matter.  You

4    don't have to do -- if it's a long thing and large parts of it

5    everyone agree are irrelevant, you can tell me that this is the

6    transcript covering minutes one through five, or something like

7    that, whatever.  But once you do that, send it over to the

8    plaintiff, and hopefully you will be able to reach agreement or

9    at least substantial agreement as to words and attributions.

10   And to the extent of your agreement that can be included as an

11   agreed transcript in the joint statement of facts.  I'm not

12   forcing you to agree if it's something you don't agree with and

13   if there's a point in dispute, you can flag in a footnote what

14   the disputed words are as you each separately hear them.

15          But given the likely importance of this piece of

16   evidence, I don't want to be at sea watching this on a computer

17   in my chambers and saying "Who said that" or "What did they

18   say?"  So your guidance for me will be helpful.

19          So, let me just ask to put the responsibility on

20   somebody, Mr. Davison, would your set of counsel take the lead

21   on putting together a first transcript and then make sure that

22   you've gotten buy-in to the extent possible from the others.

23          Will you do that, please?

24          MR. DAVISON:  Yes, your Honor, we can do that.

25          THE COURT:  All right.  Let me ask Mr. Willis --

KBNQrosC

1   excuse me -- Mr. Frankie for Mr. Willis about the -- you're

2   moving for -- proposing to move for summary judgment not just

3   on qualified immunity grounds, but I gather on the merits; that

4   there is literally no way a finder of fact viewing the evidence

5   in the light most favorable to Mr. Ross could find for your

6   client, correct?

7           MR. FRANKIE:  That's correct.

8           THE COURT:  Help me with how that is so.  In other

9   words, if you take the perspective of Mr. Ross, which is that

10  he is basically inert and not resisting, and you take the case

11  law that's been quoted to me that says, in effect, you can't do

12  that with respect to somebody who isn't a threat of violence,

13  and if you credit, I gather, a basis in the testimony to

14  believe that he wasn't perceived to be violent, how is it that

15  the excessive force issue isn't a jury claim?  There have been

16  verdicts for people who have been pepper-sprayed.  So, it can't

17  be that the nature of what happens to Ross is kind of not

18  covered by the excessive force doctrine.  Help me with

19  isolating the elements here that you think literally could not

20  viewed in a light most favorable to your adversary be found for

21  your adversary.

22          MR. FRANKIE:  Well, because -- and I think Mr. Ross

23  even conceded this at his deposition, that when they attempted

24  to handcuff him, he pulled away and made some of the comments I

25  mentioned with respect in my letter to the Court.  So, he's

KBNQrosC

1  clearly resisting.  Whether or not my client said, "Well, I

2  didn't know or necessarily perceive it as" --

3          THE COURT:  Wait.  Pause.  Pause.  He's resisting

4  what?  He's resisting going to court, but he's not in engaging

5  in force towards the defendants, right?

6          MR. FRANKIE:  Well, he's resisting being handcuffed.

7  They are trying to grab his arms so they can cuff him and take

8  him out of the cell to produce him down in the intake and go

9  through the process of having him processed for transport to

10  court.  When he's saying "no," one of the officers attempts to

11  handcuff him, and he pulls away.  I believe in his testimony,

12  he said he didn't recall whether he pulled away once or twice.

13  The officers would say it was certainly more than one time that

14  they attempted to grab hold of his arm to place handcuffs on

15  him, and he pulled away.

16          You have the additional problem of he's in ESH

17  housing, where everyone in the jail, in the facility, they know

18  that this is a special housing for people known to have violent

19  propensities, especially jail-based, of being assaultive, known

20  to being weapons carriers.  Those type of individuals are the

21  ones that get housed in this special housing so they know the

22  type of inmate they're dealing with with respect to that.

23          And the plaintiff's counsel in their letter, they say,

24  "Well, he didn't feel threatened."  But also in his testimony,

25  he says, "When I'm the probe team, and I respond to an alarm,

KBNQrosC

1     it's always a threat.  And when I'm dealing with an inmate, I'm

2     always threatened.  I treat every inmate as a threat."  And now

3     you have him saying that.  You have an inmate who's refusing to

4     be handcuffed, who pulls away, who's in ESH housing.  And I

5     think that in hearing that, in hearing those things, I think it

6     is pretty clear that just based on the facts alone that what

7     happened was, and there's a spray, which is, according to the

8     use of force continuum, the least amount of force you can use

9     with respect to using any force at all.

10          They attempted to grab him and handcuff him without

11    resorting to anything else.  That was unsuccessful.  They have

12    to produce him for court.  And the qualified immunity question

13    aside, I think that's enough to warrant summary judgment.

14          THE COURT:  One would have to consider -- I gather

15    Mr. Ross contends that he put the officers on notice that he

16    had some sort of medical condition, I mean, breathing or

17    something, right?

18          MR. FRANKIE:  No.

19          THE COURT:  There's no testimony by Mr. Ross that

20    would tend to alert the officers that he had some preexisting

21    condition, Mr. Frankie?

22          MR. FRANKIE:  No.  What he said after he was sprayed

23    and not anytime before -- because I questioned him at the

24    deposition, and I said, "When they warned you more than once

25    that they were going to spray you, why didn't you tell them you

KBNQrosC

had asthma?"  And I believe in the deposition he said something

like it slipped his mind or he was sleepy and didn't think

about it and it might have just slipped his mind; but as soon

as he's sprayed, within seconds after being sprayed, he says,

"I have asthma."

THE COURT:  Got it.  But, in other words, prior to the

termination of the spraying -- sorry -- does the spraying go on

after he says what you just quoted to me?

MR. FRANKIE:  No.

THE COURT:  All right.  Plaintiff, let's focus on that

claim.  Just very briefly why is Mr. Frankie wrong -- not

focusing now on qualified immunity but focusing just on the

merits, why is Mr. Frankie wrong about that, Ms. Dayton?

MS. DAYTON:  For two reasons, your Honor.  First, the

attempts to pull away his arm are hardly the kind of resistance

that the Second Circuit has concluded would be necessary to

preclude a jury from deciding whether Captain Willis's actions

were reasonable under the circumstances.  The entire inquiry

here is objective reasonableness, and whether an officer's

actions are reasonable depends entirely on the context.

In this case, as recounted by Mr. Davison, there were

five officers wearing riot gear surrounding Mr. Ross, who was

lying down in his bed.  All of the defendants agreed at their

deposition that he was on his bed, lying down during the entire

incident, and the circumstances were such that his act of

KBNQrosC

1   withholding his arm to be handcuffed was not the kind of

2   resistance that warranted being sprayed with a chemical agent.

3   And the DOC policy in effect at the time required Captain

4   Willis to check before spraying Mr. Ross because, I mean -- at

5   pretrial, @(unintelligible) like Mr. Ross, who has

6   contraindications for chemical agent, could have serious

7   consequences.  It could have serious consequences if he's been

8   sprayed with it.  So the resistance that Mr. Frankie is

9   referring to is simply not great enough to warrant taking this

10   question away from a jury.

11         And the other point I'd like to make --

12         THE COURT:  But does the -- yeah, go ahead,

13   Ms. Dayton.

14         MS. DAYTON:  I was going to pivot to talking about the

15   ESH housing, but I'm happy to answer your question.

16         THE COURT:  Go ahead with that point.

17         MS. DAYTON:  The Second Circuit recently addressed

18   this very point in a case called *Frost*, and it rejected the

19   argument that -- it concluded that force can be accepted under

20   circumstances where it has been clearly established even if the

21   inmate has a history of aggressive behavior.  The Second

22   Circuit quite reasonably noted that an alternative rule would

23   place few restrictions on officers' treatment of individuals

24   with extensive disciplinary records, and that those individuals

25   would therefore have fewer constitutional protections than

KBNQrosC

1    other pretrial detainees.

2              THE COURT:  All right.  Helpful.

3              Look, I think for both of you this frames the issues

4    well.  Let me ask you just one final question, Ms. Dayton.  How

5    much of the case law deals with this setting?  In other words,

6    Mr. Frankie makes the point that the nature of the particular,

7    I guess, portion of the prison that Mr. Ross was in meant that

8    the people there were at some heightened level of

9    dangerousness.  Is there a bright line in the case law that

10   says categorically, you know, refusing to give your arm over to

11   being handcuffed can never justify the spraying or are there

12   cases more fact specific and don't in as many words say just

13   that; that essentially this is a bright line rule, and if you

14   spray where a person who has done nothing but refuse to give

15   their arm over to be handcuffed, you're violating the law?

16             MS. DAYTON:  So, your Honor, I haven't -- well, I

17   guess two things.  First, there are fewer cases addressing the

18   Fourteenth Amendment pretrial detainee context, but the Second

19   Circuit has applied the Fourth Amendment case law to Fourteenth

20   Amendment excessive force claims.  The standard is the same as

21   the Supreme Court noted under *Kingsley*.

22             So, I guess, to answer the first part of your

23   question, I don't think there is as robust a case law under the

24   Fourteenth Amendment, but it doesn't matter because there is

25   plenty of case law under the Fourth Amendment, and the Fourth

KBNQrosC

1    Amendment cases have focused on whether there often is an

2    arrestee, where the arrestee was confined or was not a safety

3    threat to officers, and so the amount of resistance is always

4    assessed in proportion to the situation.  Not to mention in

5    this case, Mr. Ross was surrounded by five officers wearing

6    riot gear, and his resistance was that he was too sedated by

7    psychiatric medication to want to attend court.  And so I guess

8    the short answer is no, there is not a bright line rule, as

9    there rarely is, in this context.

10         THE COURT:  Right.  I guess the issue is part as to

11   what that may suggest on the one hand a greater facility for

12   the plaintiffs to get to a jury, but it may have bearings as to

13   qualified immunity, no?

14         MS. DAYTON:  Excuse me, your Honor, would you mind

15   repeating the question?

16         THE COURT:  Sure.  The fact that there is no bright

17   line rule on the one hand where facts and circumstances matter,

18   summary judgment tends to be less likely available.  Obviously,

19   it depends.  But where the permissibility of conduct is a

20   function of case-specific often fact and circumstances, that

21   often is the type of claim as to which a defendant has a

22   stronger argument for qualified immunity.

23         MS. DAYTON:  I understand the question.

24         So, if I stated that there was no bright line rule

25   that using pepper spray under these circumstances was

KBNQrosC

excessive, then I misspoke.  What I intended to say is that I'm

not aware of a specific case saying -- because I believe your

Honor's previous question was whether there is a specific case

saying that whether or not an inmate is in ESH housing, it can

never be a factor considered in deciding whether or not the

force was excessive.  The case that I cited before, *Frost*, the

Second Circuit case that was decided recently concluded that

that couldn't be a reason that the force could be justified,

simply the fact that it was an enhanced housing situation,

because a rule otherwise would mean that prisoners in or in

this case pretrial detainees in enhanced security housing would

have fewer constitutional rights than other pretrial detainees,

who are presumed innocent and who can't be punished under the

Constitution.

THE COURT:  Very helpful.  That answers my questions.

Counsel, let me stop at this point.  I think you all

get a sense of the basic interplay here.  Sorry, forgive me.  I

erred here.

Ms. Dayton, I have one other set of questions to ask

you.  The theory of failure to intervene, is it that the

defendants had an obligation to intervene before the

constitutional violation began or is it that they had an

obligation to intervene during the spraying or both?

MS. DAYTON:  It's absolutely that they had an

obligation to intervene once they knew that the violation was

SOUTHERN DISTRICT REPORTERS, P.C.•••
(212) 805-0300

1    likely to occur.

2             THE COURT:  Likely to occur.  In other words, your

3    claim is not confined to the duty that arose once the spray

4    began to be fired.  You're saying that at some point

5    beforehand, Genoves and George understood from Willis's

6    statements and behavior that he was apt to engage in excessive

7    force; he was apt to spray somebody whom the law categorically

8    forbade him from spraying.

9             MS. DAYTON:  They testified at their deposition that

10   they heard Captain Willis say that he was going to spray

11   Mr. Ross, and they knew that Captain Willis had not followed

12   the steps that are required under DOC policy, including to

13   check to see if inmates have contraindications for the use of

14   pepper spray.

15            THE COURT:  All right.

16            MS. DAYTON:  I just wanted to clarify, your Honor, the

17   standard is *Hurley* is an officer who observed a Constitutional

18   violation or has reason to know that it will be.

19            THE COURT:  I will benefit -- because usually when I

20   see this problem, it involves a violation under way.  I will

21   benefit to the extent you are able to collect cases when you're

22   defending against the motion for summary judgment on the

23   failure to intervene, I'm eager to see cases that apply -- and

24   this is for both sides -- that apply failure to intervene

25   standards where the conduct is essentially about to occur but

KBNQrosC

hasn't occurred.  And the reason I say this and this should be

obvious to all is, at least based on the letters, the duration

of the spraying is extremely short.

So, if the defendants, Genoves and George, didn't have

an obligation until the spraying began, then you wind up with

an issue of how reasonable is it for the law to require

intervention during what may be only a two-second period.

If, on the other hand, there is a duty to intervene

that precedes the beginning of the spraying and is, in effect,

as Ms. Dayton says, at the point in which the spraying becomes

likely, that moves the starting gun from a time perspective

back a number of seconds and makes the claim stronger.

I'm eager for both of you in your summary judgment

briefs to engage with apposite authority that deals with

officers who were being faulted for failure to intervene where

no violation is likely to occur but before it has begun to

occur.  So just as a note, that will be of assistance to the

Court in your briefing, so please be alert to that.

With that, let me  -- and this is obviously not the

forum in which to debate to conclusion the merits.  I just

wanted to get a better understanding of the principal arguments

or the areas of them that I needed a little help with, and I

want to thank Ms. Dayton, Mr. Frankie and Mr. Davison for

sharpening my understanding of the case.

Let me turn next just to the process for briefing

KBNQrosC

summary judgment.  Time and again, I have asked or directed
counsel to precede the filing of the first brief with a JSF, a
joint set of stipulated facts.  The JSF looks a little bit like
a 56.1 statement in that it is a numbered list of individual
factual propositions.  What is it intended to be?  It is
intended really just to be a list of those facts that all
parties agree are accurate.  You're not stipulating to
materiality.  You're not stipulating to admissibility.  You're
simply stating that the fact is true.

        And what I tend to do is I put the initial drafting
onus on a moving party.  That person then drafts up as long a
set of stipulated facts as they feel is necessary or they can
come up with, and then the pen turns to the other party or
parties to annotate it and to add to it; but at the end of the
day, we wind up with hopefully a fulsome set of facts that are
not really disputed.

        And the benefit of all of this is in the 56.1
statement, you need not cite authority or the exhibit or the
transcript cite for the proposition in question.  It is your
act of stipulating that establishes that fact.  And, therefore,
all the hard work that goes into a 56.1 statement where you're
harvesting depositions and dates and physical evidence and so
forth, all of that goes away as to the JSF.  To the extent
there are facts you don't stipulate to, you need to showcase
them to me in the usual way through a 56.1 statement joined, no

KBNQrosC

1   doubt, by a 56.1 opposition.

2           But I am told time and again by counsel that this

3   device winds up being a timesaver.  It means that when you

4   begin drafting your summary judgment brief, you've got handy

5   dandy a set of stipulated facts that may cover a very large

6   amount of the waterfront, and it makes it a lot easier to draft

7   your facts.  And I in turn, and my law clerk in turn,

8   invariably find it helpful to have a fulsome set of stipulated

9   facts.

10          My law clerk will send you after this call three or

11  four examples of go-bys, of models of particularly well-done

12  JSFs that my chambers has received which will help give you

13  some guidance.  But, trust me, you will find this useful in

14  your 56.1 statements with the, you know, documentary or

15  deposition backup to show that there is admissible evidence to

16  prove the proposition will, of course, be correspondingly

17  smaller.

18          Let me -- I'm going to put on the defense as the

19  movant the onus of doing the first draft of the JSF, and I

20  think what I will do is put it on counsel for Genoves and

21  George, who also happen to represent the counterclaim defendant

22  the City, the first obligation to draft it.  I expect you'll be

23  in active touch with Mr. Frankie as you do it so that

24  ultimately what goes to the plaintiff will be a set of proposed

25  stipulated facts that both sets of defendants agree are

KBNQrosC

1    accurate.  And then, Ms. Dayton, you and your colleagues are to

2    look at it where the fact stipulated to by the defense is or

3    proposed by the defense for stipulation is clearly accurate.  I

4    expect you'll accede to that, but you should tweak any facts

5    where as articulated they are misleading or inaccurate, and you

6    should obviously add other facts.  But this is not a game.  I

7    don't want people trying to knock out each other's facts by

8    adding adjectives or adding spins that they would like or

9    adding legal coloration.  That's out of bounds.  This is, you

10   know, counsel are expected to behave collegially and

11   acknowledge facts that are undisputed.  If the defendant or the

12   plaintiff admitted something in a deposition, it is what it is.

13          And part of the JSF is also a nice forum for you to

14   authentic documents.  Exhibit 1 is a videotape, which was taken

15   from such and such an angle from such and such a person that

16   captures the time period, you know, X to X plus ten minutes or

17   whatnot.  But it's an opportunity for you as well to authentic

18   and attach exhibits.  Again, the facts that are in the JSF are

19   not -- you're not stipulating to admissibility or materiality

20   that matters to Ms. Dayton that, you know, the Mets won World

21   Series in 1969, since that's a determinable fact, everyone

22   should stipulate to it, and later on you can tell me why that

23   was irrelevant, but the point is it's 's not about relevance,

24   it's just about factual accuracy.

25          So, the question for you, Mr. Davison, since you'll

KBNQrosC

1    have the first pen on this, usually I give parties about a

2    couple of weeks to get a JSF in.  In a case like this, I would

3    do it shorter because of the very tight timeframe in which all

4    events play out.  On the other hand, I'm mindful there's

5    Thanksgiving.  So, I'm inclined to basically give all of you --

6    what's today -- November 23, let us say, you know, two weeks to

7    get the JSF, something like December 7 or so.  If you need a

8    day or two more, speak up now, but can you do that?

9         MR. DAVISON:  Yes, your Honor.  I believe we can do

10   that from defendants George and Genoves.

11        THE COURT:  The goal is I want the whole thing

12   submitted within two weeks.

13        MR. DAVISON:  Oh, yes.

14        THE COURT:  That's going to be the trigger that

15   then -- from which the deadline for the first brief by defense

16   counsel, or each set of defense counsel, has to come in.  So

17   the idea is if I give you two weeks to submit a JSF, at about

18   the halfway point or so of that, you ought to be turning around

19   the draft to your adversaries, you know, so that they can then

20   do a turn on it promptly amending inaccurate or problematic

21   statements but mostly adding their own.

22        So, what I would have thought would be the due date

23   would be December 7, but before we go there, I'm giving you a

24   chance to tweak that.

25        MR. WEINER:  Your Honor, this is Joshua Weiner for

KBNQrosC

1    defendants Genoves, George and the City.  I'm sorry to

2    interrupt.  I just want to pipe in and say I think given the

3    upcoming holidays, three weeks might be more realistic.  A lot

4    of things that -- a lot of documents that we prepare often have

5    to be seen by others, so those people are probably the people

6    who will be supervising us are expected to be out of the office

7    for some period of time.  So I think maybe three weeks for the

8    whole joint statement of facts would be appreciated.

9           THE COURT:  I'm amenable to that.  That's fine.  But

10   keep in mind that, look, this is as narrow a factual prism as

11   you're going to get.  It's a very short series of events that

12   plays out over a very limited period of time.  So, that's fine,

13   but I don't want to -- you know, I'm anticipating a rather

14   compact briefing schedule here, and if I move this to

15   December 14, the next thing you're going to tell me is the next

16   extension takes us into the holiday days, and I'm really trying

17   to move this a bit.  Can we possibly do it -- because I would

18   like to get your opening brief in before the holidays.  If we

19   make it instead of December 14, which is a Monday, something

20   like December 10, which is a Thursday, can we make that work,

21   and that way it would be more realistic for me to give you a

22   two-week deadline for your opening brief, Mr. Weiner.

23          MR. WEINER:  Yes, your Honor, I think that would work.

24          I had another question about the joint statement of

25   facts while we're discussing it.  Your Honor mentioned that it

KBNQrosC

1    would be an opportunity to authenticate documents.  I took that

2    to mean authenticate documents for the purposes of the motions

3    for summary judgment, not for later at trial.

4              THE COURT:  No, no, no.  I mean, if you're stipulating

5    to a fact that this video is authentic, you can't go back on

6    that later on.  The whole point is -- I mean, you're not

7    stipulating to admissibility, but you're authenticating the

8    document.  This exhibit is an email from person A sent on date

9    B.  This video is the video taken outside of Mr. Ross's cell.

10   That's what I mean by authenticating.  Obviously, if you

11   authentic a baseball from the 1969 World Series, it's

12   authenticated, but it's not admissible, but I'm talking about

13   authentication.

14             MR. WEINER:  Right, I understand.  I guess my question

15   was more, say, there's a document that wouldn't go to summary

16   judgment but might go to trial, such as maybe an impeachment, a

17   document that pertains to impeachment or something like that,

18   would that be sort of part of the process of the joint

19   statement of facts?

20             THE COURT:  No, you're not obliged to put before me

21   material that nobody is relying on at the summary judgment

22   stage -- prior inconsistent statements, you know, criminal

23   record used to impeach, things like that.  You're not obliged

24   to empty your evidence cart here.  But to the extent that

25   you're addressing a piece of evidence and you make a

KBNQrosC

1    stipulation to it, you're bound by it all the way through.

2    It's not a game where you can change your position about this

3    is authentic or this happened later on.  If you stipulate that

4    an event happened, that a witness said a particular thing, that

5    a tape is authentic, that a particular email accurately

6    reflects an email sent by Jones to Smith on a particular day,

7    you're bound by that all the way through, OK?

8            MR. WEINER:  Yes.  No, your Honor.  My question was

9    more going towards the scope of the documents that should be

10   included.

11           THE COURT:  No.  This doesn't limit what you can do at

12   trial in terms of scope.  You're welcome to offer other things.

13   I've had cases indeed defended by the City where the JSF

14   covered a certain amount of material, the case nevertheless

15   went to trial, and then the City had a ton of other material in

16   the nature of impeachment evidence, which proved to be very

17   effective, but really which had no proper place on summary

18   judgment.  That happens all the time, and that's fine.

19           Does that answer your question?

20           MR. WEINER:  Yes.  Thank you, Judge.

21           MR. FRANKIE:  Your Honor, I'm sorry, this is

22   Mr. Frankie.  Your Honor, just so I understand, Mr. Davison, as

23   you said, is the first one that's going to put, I guess, pen to

24   paper on this.  Then he gets it to me or we confer -- after I

25   see his first draft, we confer, and then we have to get that

KBNQrosC

1    then to plaintiffs.

2              THE COURT:  Yes.

3              MR. FRANKIE:  I understand your concern with the

4    constraints, but, for example, I don't know when they're going

5    to get their first draft.

6              THE COURT:  Mr. Frankie, this is really not

7    complicated.  You're working hand-in-glove with these people.

8    You're collaborative.  You're professional.  I'm giving you

9    three weeks.  That means it takes about a week and a half to

10   get it to the other side.  You're perfectly capable of banging

11   out tonight on your computer the propositions that matter to

12   you and send it over to them, and ask them to include it.

13   You're not a bump on a log.  This is not hard.

14             MR. FRANKIE:  Fair enough.  I'm just thinking because

15   of the holiday, and I actually have a virtual trial starting a

16   week from today that should only last a few days, but I'll work

17   it out with them.

18             THE COURT:  Look, remember, this is about as compact a

19   storyline as you're ever going to get in a federal trial, and

20   it shouldn't be hard for you to take an hour of your time

21   reviewing the records in your case and identify in some

22   coherent way the discrete factual propositions that you want to

23   be in the JSF, in effect, what you feel you are going to need

24   to ably litigate the motion for summary judgment that you have

25   already written me about.

1          MR. FRANKIE:  OK.

2          THE COURT:  So, look, I'm going to set December 10 as

3     the deadline for the JSF.  Mr. Davison, I expect that before

4     you do the turn, before you send it to the plaintiffs, you will

5     be collaborating with Mr. Frankie.  So it is incentive for you

6     to get out of the gate pretty quickly on this.

7          MR. DAVISON:  Yes, your Honor.

8          THE COURT:  Now, plaintiff, I take it with my having

9     already granted the extra week, I take it, Ms. Dayton, the

10    prospect of getting me a JSF from the plaintiff's perspective

11    by December 10 is not a problem.

12         MS. DAYTON:  That's correct, your Honor.

13         THE COURT:  OK.  So then, defense, I would like to

14    make your respective summary judgment motions -- and they are

15    obviously separate; they are closely related, but they are

16    distinct -- due two weeks from December 10.  In other words,

17    the 24th.  You're welcome to get that in early.  If anyone is

18    leaving for the holidays these days, you're welcome to get it

19    in early.  There's nothing that prevents you from doing that,

20    but usually counsel tell me that they're thinking about and

21    working on their summary judgment motions as they are drafting

22    the JSF because the JSF is awful close to a statement of facts.

23    It's not literally a statement of facts, but particularly for

24    the defense as a movant, you are thinking about, you know, what

25    facts I want in there.  And so in the process of drafting and

KBNQrosC

```
 1   in the process of preparing, stipulated facts very much are
 2   interlocked.
 3           So, beginning with you, Mr. Davison, due date
 4   December 24 for your opening motion?
 5           MR. DAVISON:  Yes, your Honor, that should be fine.
 6           THE COURT:  And Mr. Frankie?
 7           MR. FRANKIE:  Yes.
 8           THE COURT:  Now, plaintiff's counsel, usually I give
 9   two weeks for an opposition to summary judgment.  I am mindful
10   though that the first of those weeks is the week when any
11   lawyer has sought to take their vacation.
12           Am I correct, Ms. Dayton, that you are not -- your
13   team is not an exception to that rule?
14           MS. DAYTON:  That's correct, your Honor.
15           THE COURT:  All right.  So, let me give you three
16   weeks.  I'm just being a realist here, having been a practicing
17   lawyer back in the day.  How about January 14, which is three
18   weeks for plaintiff's opposition?
19           MS. DAYTON:  That works for us, your Honor.
20           THE COURT:  And then the 14th, if my math is right,
21   puts it at a Thursday.  How about 11 days from then, the 25th,
22   which is a Monday, for the defense reply, Mr. Davison?
23           MR. DAVISON:  Yes, that's fine, your Honor.
24           THE COURT:  And Mr. Frankie?
25           MR. FRANKIE:  Yes, your Honor.
```

KBNQrosC

1          THE COURT:  Good.  I will issue a scheduling order

2     that literally just sets out those dates.  My law clerk will

3     email you today or tomorrow several models which I think will

4     give you a sense of way these look.  But, trust me, if you

5     haven't done it before -- and I think most counsel in the

6     district have done this many times because I'm not the only

7     judge who insist on this -- I think you will find it to be, if

8     not life-changing, useful.

9          With that, let me just ask before we adjourn just

10    going around the horn but beginning with the movants if there's

11    anything else that I can usefully take up at this premotion

12    conference.  Mr. Davison?

13          MR. DAVISON:  No, your Honor, I think that is all.

14          THE COURT:  Mr. Frankie?

15          MR. FRANKIE:  No, your Honor.

16          THE COURT:  And Ms. Dayton?

17          MS. DAYTON:  Nothing from plaintiffs.

18          THE COURT:  All right.  Look, I want to wish everyone

19    a healthy and happy holiday season.  I know how bizarre the

20    season is and how trying the year has been, and I hope all of

21    you are able to find some fun and solace and have some

22    relaxation during the holidays.  I wish you all well and look

23    forward to seeing you down the road.

24          I will reserve for now on whether to have oral

25    argument in the case.  It just depends on based on my review of

KBNQrosC

1     the papers as they come in where it feels like the kind of case

2     where I would be advancing the ball by having argument or

3     merely making counsel engage in an exercise that isn't

4     ultimately that helpful in deciding the case, but I will make

5     that judgment once I review the papers.  In any event, be well,

6     stay safe, and I look forward to seeing you down the road.

7                   Thank you.  We stand adjourned.

8                   ALL COUNSEL:  Thank you, your Honor.

9                   (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25