UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

ANTOINE ROSS,                                          Docket #16CV06704 (PAE)(KNF)

              Plaintiff

        - against -

CAPTAIN DION WILLIS, CORRECTION
OFFICER GEORGE, SHIELD #732,
CORRECTION OFFICER GENOVES,
SHIELD #17683, and CITY OF NEW YORK,

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**REPLY MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFF'S OPPOSITION
AND IN FURTHER SUPPORT OF
DEFENDANT DION WILLIS' MOTION FOR SUMMARY JUDGMENT**

Frankie & Gentile, P.C.
Attorneys for Defendant
*Dion Willis*
1527 Franklin Avenue
Suite 104
Mineola, New York  11501
(516) 742-6590
Email:  frankieandgentile@gmail.com

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                      <u>PAGES</u>

<u>Anderson v. Creighton</u>, 483 U.S. 635 (1987)                               12

<u>Bah v. City of New York</u>, 319 F. Supp. 698 (50 NY 2018)                 5

<u>Bayway Ref. v. Oxygenated Marketing & Trading, A.G.</u>, 215 F.3d
219, 226 (2d Cir. 2000)                                                      14

<u>Bell v. Wolfish</u>, 441 U.S. 520 (1979)                                    6

<u>Dist. of Columbia v. Wesby</u>, 138 S.Ct. 577, 589 (2018               7, 12, 13

<u>Ismael v. Charles</u>, No. 18-CV-3957 (GHW) 2020 U.S. District
LEXIS 12429 at *28-*30 (SDNY July 15, 2020)                                 7

<u>Jones v. Truebig</u>, 963 F.3d 214 (2d Cir. 2020)                         5, 6

<u>Mullenix v. Luna</u>, 136 S.Ct. 305, 308 (2015)                           12

<u>Rizk v. City of New York</u>, No. 14-CV-6434 (RRM)(RER) 2020 U.S. District
LEXIS 90918 at *28-*29 (EDNY May 22, 2020)                                  5

<u>Saucier v. Katz</u>, 533 U.S. 194 (2001)                                  12

<u>Soto v. Gaudett</u>, 862 F.3d 148 (2d Cir. 2017)                          5, 6

<u>Tracy v. Freshwater</u>, 623 F.3d 90 (2d Cir. 2010)                       5, 6

**REPLY**

DOC policy provides that an inmate refusing to attend a scheduled court appearance constitutes an anticipated use of force scenario.  Defendant Willis submits that the procedures for probe team response and extraction teams appear to have been conflated in the discussions and arguments by plaintiff herein.

On June 14, 2016, plaintiff Ross, a detainee inmate, was refusing to attend his scheduled court appearance.  Captain Latonia Monroe informed her superior, Tour Commander Assistant Deputy Warden Dunbar, concerning Ross' refusals.  The Tour Commander directed Captain Monroe to record the refusal on camera, which she did.

Thereafter, the Tour Commander, at approximately 6:45 a.m., activated an alarm and dispatched Captain Willis to lead a probe team response to inmate Ross' cell.  Chief Kenneth Stukes, the City's 30(b)(6) witness, testified that this was not a probe team scenario (Ex. "F" at 257-58).

Had the Tour Commander properly followed DOC protocols, an alarm would not have been activated and a probe team would not have been dispatched.  Rather, the Tour Commander would have directed the formation of an "extraction team" which would have then triggered extraction protocols which consist of:  assembling an extraction team consisting of a supervisor (captain) and six (6) officers suited in riot gear, contacting Mental Health,[1] and obtaining information from the medical clinic as to whether the inmate was contraindicated for the use of chemical agents and/or an electronic immobilization shield.

---

[1] It was undetermined whether any mental health staff were available in the building at that time.

As noted, rather than direct the assembly of an extraction team, the Tour Commander dispatched a probe team under the supervision of Captain Willis.  Captain Willis and his probe team responded as ordered.  Prior to responding, the Tour Commander informed Willis of the nature of the response, i.e. that Ross was refusing court (Ex. "R" at 95).

Willis testified that since the Tour Commander had dispatched him to what was an anticipated use of force scenario, he believed that the necessary steps, including checking for contraindicators, had been taken by the Tour Commander.[2]  (Ex. "R" at 95-96).

Upon arriving at Ross' cell, the cell door was open and Ross was lying in his bed.

Probe team members, including Captain Willis, entered the cell and attempted to convince Ross to simply comply and attend his scheduled court appearance.[3]  Ross did not comply.  Probe team members attempted to handcuff Ross in order to escort him from the cell, but Ross physically resisted.  (Ex. "O" at 1:03-1:30; Ex. "R" at 83, 89).

Plaintiff claims that he did not resist, and told probe team members that he was sedated, couldn't move and on drugs.  In most instances, a court, in a summary judgment motion, would credit such assertions of the non-moving party.  However, as this Court is aware, there is an audio recording along with the video, and a transcript as to what transpired.  Accordingly, the Court need not credit assertions of the non-moving party which have been demonstrated to be untrue.

The relevant portion of the transcript provides as follows:

(Defendant Willis):           "We have to take you outta here."

---

[2] Willis testified that had he learned of Ross' asthma diagnosis prior to spraying, he would have "double checked" with the Tour Commander concerning contraindicators.

[3] Chief Stukes explained that when a probe team responds, circumstances may change, and the probe team has the authority to act with whatever minimum force may be necessary (Ex "F" at 131).

(Defendant George):          "Come on, we gotta take you down" (inaudible).

(Mr. Ross):                  "I'm going to sleep, do not touch me bro, do not touch me bro"

(Defendant Willis):          "Alright, listen, we gotta go"

(Mr. Ross):                  "Bro, don't touch me, son"

(Defendant Willis):          "Come on you gotta go, grab him, you gotta go"

(Mr. Ross):                  "Grabbing me. . .grabbin' my arm while I'm on drugs, boy."

(Mr. Ross):                  "What's wrong with you boy?  Is you crazy?

(Mr. Ross):                  "What's wrong with you, son?

(Defendant Willis):          ". . .go downstairs, I'm gonna tell you now, I need to take you out

                             or I'm gonna spray you.  I'm gonna give you one opportunity"

(Mr. Ross):                  "Spray me for what"

(Defendant Willis):          "For you to come out (inaudible)

(Mr. Ross):                  Y'all niggas is crazy son, y'all niggas is crazy."

(Spray deployed)

(Defendant Willis):          "Cuff him" (Exhibit "O")

     Clearly, Ross did not claim to be sedated, and did not claim to be unable to move.  Ross did accuse staff of grabbing him and grabbing his arm while he was on drugs.[4]  He is clearly, actively resisting.  If Ross "couldn't move" as claimed, staff would have had no difficulty in handcuffing him.  But they did, because Ross physically resisted their attempts.

---

[4] Willis acknowledged hearing Ross say "while I'm on drugs" when the audio was played at his deposition, but explained that he did not hear Ross say that at the time.  The parties agree that Willis was wearing a riot helmet and gas mask during the encounter with Ross.

Moreover, at his deposition, Ross testified, "staff must have been pulling on my arm to get me to court." When asked if he pulled away, Ross stated that he didn't remember (Exhibit "I" at 102, 103).

Willis testified that as staff attempted to handcuff Ross, he pulled away (Exhibit "R" at 83, 89).

In addition to the obvious physical resistance depicted on the recording of the incident, by claiming he does not recall if he resisted, Ross cannot now contest the probe team's assertions that he in fact physically resisted their efforts to handcuff him.

Plaintiff understands that his demonstrated physical resistance undermines his claims herein. No doubt this explains the often repeated claim in plaintiff's memorandum that plaintiff did not resist. However, plaintiff's claim is simply not true. Equally untrue are his claims that he explained to the probe team members that he was sedated and couldn't move. Plaintiff physically resisted and his repeated claims to the contrary can't change that simple fact.

Additionally, plaintiff's claims of being sedated as a result of the anti-anxiety drug Remeron are suspect at best. At no time on the audio recording can Ross be heard stating this as claimed. Moreover, there is no documentary evidence that Ross took Remeron the night before as claimed, but even if he had, Ross' medical records from May 12, 2016, just one month prior to the incident, indicate: "He reported taking Remeron regularly with good response and no untoward side effects" (Exhibit "P" DEF 1359). Thus, while "drowsiness, fatigue and dizziness" are "potential" side effects of Remeron, clearly Ross, by his own admission, did not experience these side effects.

Plaintiff claims that he was not a threat, yet he was an Enhanced Supervision Housing inmate who was refusing to be handcuffed.[5] He physically resisted. Officer Genoves noted that when an inmate refused to be handcuffed, you don't know what their intentions are and are therefore somewhat of a threat (Ex "Q" at 89).

Plaintiff seeks to now add an additional theory in support of their claims, i.e. that the spray was from less than six feet away. Plaintiff seeks to do so in overly dramatic fashion by claiming the spray occurred at "close range", a reference in no way explained. However, there is no objective evidence to support this claim, only conjecture and counsel's opinion as to distances. Additionally, while spraying closer than six feet may be a DOC policy violation, subjecting an employee to administrative discipline, it does not constitute a violation of a clearly established constitutional right. Quite simply, the spraying of plaintiff from five feet away, four feet away or even less does not rise to a constitutional violation, even if true. Section 1983 does not provide a remedy for best police practices, and accordingly, an act or omission that violates policy but does not also violate constitutional rights is not actionable under §1983. Rizk v. City of New York, 14 CV 6434 (RRM)(RER) 2000 U.S. Dist. Lexis 90918 at *28 -*29 (E.D.N.Y. May 22, 2020). See also Bah v. City of New York, 319 F. Supp. 698 (S.D.N.Y. 2018).

Plaintiff cites Tracy v. Freshwater, 623 F.3d 90 (2d Cir. 2010), Jones v. Truebig, 963 F.3d 214 (2d Cir. 2020) and Soto v. Gaudett, 862 F.3d 148 (2d Cir. 2017) as support for his claim and questions that defendants did not address these cases.

---

[5] Enhanced Supervision Housing is for inmates who present a significant threat to the safety and security of the facility if housed elsewhere. (Ex. "L" §1-16)

The simple response is that these cases are not applicable.  Plaintiff Ross herein was actively resisting the probe team's efforts to handcuff him.  Tracy, supra, involved a police encounter.  Tracy was already handcuffed and complying when sprayed.  Jones, supra, involved a police encounter, where a suspect, while not handcuffed, was face down on the ground with arms spread, was not trying to get up and there was no evidence to suggest that he was being non-compliant when sprayed.  And, Soto, supra, involved an individual who had been struck by a police cruiser, then tased and thereafter tased again while although not handcuffed, had stopped and no longer posed a risk of flight when tased for a second time.  Moreover, it was not suggested that Soto was being noncompliant when tased again.  None of these cases are applicable to the facts herein.  Additionally, none of these cases occurred in a correctional setting when courts have shown deference to the government's discretion in providing for the safety and security of their facilities.  Bell v. Wolfish, 441 U.S. 520 (1979).

Case law addressing the issues presented herein tend to be fact specific.  None of the individuals in the cited Tracy, Jones or Soto cases were actively resisting efforts to handcuff them, and none were in a correctional facility with a mandated court appearance.

The force employed to plaintiff Ross was minimal and constituted the lowest level of force under the DOC use of force continuum (Ex. "C" at DEF0066-0067).

Plaintiff did not tell staff that he was sedated and could not move, as clearly evidenced by the audio recording.  Moreover, it is equally clear that plaintiff actively resisted staff's efforts to handcuff him.  The force used in response to plaintiff's active resistance and threat level was minimal, proportional in nature and not excessive.

Alternatively, even if the force employed, a one second burst of pepper spray, is determined to be excessive, defendant Willis is shielded by the doctrine of qualified immunity.

Plaintiff argues herein that DOC staff receive training concerning Directives, Operation Orders and Rules and Regulations.  Those Directives and Operation Orders authorize force, including the use of chemical agents (pepper spray) to enforce DOC rules and regulations and court orders (Ex. "B" at Section V.A. 2, DEF0815).  See also (Ex. "A" at Section III, A and B, DEF0824) and (Ex. C at Section IV. 4., DEF0063).

Additionally, the Court held in Ismael v. Charles, No. 18 CV 3957 (GHW) 2020 U.S. DIST. LEXIS 12492 at *28-*30 (S.D.N.Y. July 15, 2020) "it is not clearly established that pepper spraying an uncooperative inmate is unlawful."  If this premise was not clearly established in July, 2020, it certainly was not clearly established on June 14, 2016.

As previously noted, in the instant action, plaintiff Ross was not only uncooperative but was also physically resisting the probe team's efforts to handcuff him in order to produce him for his scheduled court appearance.

"Clearly established means that at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he was doing was unlawful." Dist. of Columbia v. Wesby, 138 S.Ct. 577, 589 (2018).  Existing law must have placed the constitutionality of the officer's conduct beyond debate, Id.

The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances he or she faced." Id. at 590.

The Court, in <u>Ismael</u>, <u>supra</u>, held that it is not clearly established that spraying an uncooperative inmate is unlawful.  Moreover, when viewed with the additional backdrop that DOC authorized the use of chemical agents (pepper spray) to enforce rules and regulations of the agency and court orders, under the totality of the circumstances herein it cannot be said that an officer in Willis' position would find his conduct objectively unreasonable.  Accordingly, defendant Willis is entitled to summary judgment under the doctrine of qualified immunity.

*       *    .  *

The complaint does not establish a sufficient basis for a deliberate indifference to medical needs claim.  While the Fifth Amended Complaint may have been filed when plaintiff was proceeding pro se, he has been represented by able pro bono counsel in the form of a large law firm with no less than three (3) attorneys, including a partner handling his case since February 11, 2020.  No application to amend the complaint has been made in the near one year since counsel's appearance herein.  Thus, while plaintiff's counsel's agreement to appear pro bono and provide their services without compensation is commendable, plaintiff should not be afforded the deference given to pro se litigants.  Defendant Willis submits that the complaint simply does not present a deliberate indifference to medical needs claim.

Even if the Court, in its review of the 5th Amended Complaint, does so with deference to plaintiff's pro se status at the time the complaint was filed, a claim for deliberate indifference to medical needs is not plead or even stated.

The complaint does not allege that Captain Willis was aware of plaintiff's asthma diagnosis, nor does it allege any requisite mental state with respect to Willis' action.  There exist no allegations that Willis acted with reckless disregard concerning plaintiff's medical needs, that

8

he delayed treatment or that his actions were in any way punitive in nature.  Moreover, the attachment of excerpts from Investigator Longi's report can neither cure nor adequately supplement the pleading's deficiencies in this matter.

Plaintiff was sprayed because he actively resisted defendants' efforts to handcuff him and produce him to his scheduled court appearance.

Defendant Willis was a probe team supervisor dispatched pursuant to an alarm.  Willis was not aware of plaintiff's asthma diagnosis and was not informed of such until plaintiff did so after he was sprayed.  At no time prior to being sprayed did plaintiff inform Willis or any probe team member of his asthma diagnosis, despite prior warning by Captain Willis that spray would be deployed.   Rather, plaintiff responded, "Spray me for what?" indicating an understanding of the spray advisement.

Captain Willis indicated in his testimony that because the Tour Commander had ordered his response to a known anticipated use of force scenario, i.e. court refusal, that he believed that the Tour Commander had addressed DOC protocols including the checking for contraindicators (Ex. "R" at 95-96).

Captain Willis was not aware of plaintiff's asthma diagnosis and in fact testified that had Ross informed defendants of the asthma diagnosis, that it would have "very possibly changed the way he proceeded."   Willis testified that he would have called the tour commander to "double check" if chemical agents could be utilized (Exhibit "R" at 154).

As already discussed, Captain Willis was aware of the nature of the alarm response before his arrival at Ross' cell because the tour commander told him that the alarm was in response to

Ross having refused production for court.  Captain Willis believed the necessary protocols were followed (Exhibit "H" at 96).

Captain Willis' actions were not objectively unreasonable nor were they reckless.  Ross was physically resisting staff.  Willis was not aware of Ross' asthma diagnosis.  Ross never informed of such until after he was sprayed.  Moreover, Willis believed that the Tour Commander had followed protocol when she ordered him to respond as a probe team leader to an anticipated use of force scenario.  Had Willis been provided with any information concerning Ross' asthma diagnosis, he would have "double checked" with the tour commander (underline added).

Willis' actions were not punitive in nature, but rather in response to Ross' physical resistance to being handcuffed.  Willis testified that Ross actively resisted, a fact clearly established by the audio and its transcript.  He sprayed because he believed this was his best option, and safer than just forcefully trying to handcuff him (Ex. "R" at 88, Plaintiff's Ex. "I" and Ex. "O").

Plaintiff Ross' Fourth Amended Complaint alleged that defendant's motivation for spraying him was in an effort to produce him for court.  It cannot be said that Willis' actions constituted a desire to punish, nor do they amount to a reckless disregard under the circumstances of this case.

Plaintiff did not sustain injury in this matter.  The effects of the pepper spray were DOC's intended effects, i.e. temporarily incapacitate in order to lessen or eliminate entirely the need for physical force.  This makes the encounter safer for both staff and inmate.

Upon being sprayed, Ross was immediately handcuffed without need for further force and escorted from the cell.  Removal from the affected area is the first step in the

10

decontamination process. When Ross dropped to his knees and would no longer walk, a gurney was provided. Ross was escorted on the gurney to the intake area, where he was placed in a shower where the effects of the chemical agents could be rinsed off. He was permitted to shower until he stated he was relieved. (Ex. "S" at 76).

Ross was examined in the medical clinic by Physician's Assistant Larry Blackmore, who noted the following findings:

a) Patient had no distress;

b) No O/C noted on him;

c) No injury noted;

d) No treatment indicated.

(Exhibit "K" at 133-134, Exhibit "J" DEF 0121, and JSSF at No. 58-59).

Plaintiff seeks to suggest that whatever injury plaintiff sustained may have resolved because he was not examined by P.A. Blackmore until 10:20 a.m. However, a review of Exhibit "J", the document used to log an inmate in to be seen at the clinic, indicates that it was completed at 7:10 a.m., immediately after the incident.

P.A. Blackmore explained that once in the clinic, inmates may be triaged and examined in order of medical necessity (Exhibit "K" 133-34). Moreover, plaintiff had stopped showering and informed DOC staff that he was relieved. (Ex. "S" at 76).

Plaintiff seeks in their submission to equate the use of pepper spray to exposure to toxic substances and carcinogens. Pepper spray is a substance approved for use by law enforcement, and defendant is unaware of any study, and plaintiff points to no study, that equates pepper spray with toxins or carcinogens.

11

Defendant Willis submits that he is entitled to summary judgment on both the excessive force claim as well as the deliberate indifference claim should the court decide it was sufficiently pled by plaintiff.

It is clear from the record presented that Ross was physically resisting defendants' efforts to handcuff him in order to produce him for his court appearance.  The force used was reasonable, necessary and proportional.

Defendant Willis was not aware of Ross' asthma diagnosis, and reasonably believed the tour commander who ordered him to an anticipated use of force scenario would have checked for contraindications before doing so.  His actions were not reckless under the circumstances.

The defendants' actions were not punitive, but rather taken to insure Ross' presence in court.  This was acknowledged by Ross in his Fourth Amended Complaint.

Defendant submits that under the totality of the circumstances of this case, it cannot be said that a clearly established constitutional right as to either claim has been violated. Defendant's conduct was neither reckless nor punitive in nature.  Moreover, plaintiff did not sustain significant injury, if any, herein.  Should the Court determine that there is a disputed fact as to whether a constitutional violation occurred, defendant Willis is nonetheless entitled to summary judgment under the doctrine of qualified immunity as his actions were not objectively reasonable, Anderson v. Creighton, 483 U.S. 635 (1987); Saucier v. Katz, 533 U.S. 194 (2001). Defendant submits that these arguments were also presented throughout his initial memorandum.

The Tour Commander had ordered Willis and his probe team members to respond to what has been established to be an anticipated use of force under DOC policy.  DOC protocols provide

that the Tour Commander should have directed a captain to assemble and extraction team rather than activate an alarm and order Willis to lead a probe team to the area.  The checking for contraindicators is a procedure for an extraction team captain and/or tour commander, not a captain responding as a probe team supervisor.

It was not objectively unreasonable for Willis to believe that his superior Assistant Deputy Warden Dunbar had followed contraindicator protocols, since it was she who ordered him to the alarm response and knew the nature of the response.

Moreover, once the probe team sought Ross' compliance and Ross physically resisted efforts to handcuff him, the dynamics of the response changed.  It was no longer an anticipated use of force scenario, but an actual use of force precipitated by Ross' actions.

The doctrine of qualified immunity protects government officials and employees such as Captain Willis where in the performance of their discretionary functions, his actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Mullenix v. Luna, 136 S.Ct. 305, 308 (2015).  "Clearly established means that the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he was doing was unlawful."  Dist. of Columbia v. Wesby, supra.  Existing law must have placed the constitutionality of the officer's conduct beyond debate.  Id.

As noted herein, the Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since to do so avoids the crucial question whether the official acted reasonably in the particular circumstances he or she faced."  Id. at 590.

In light of the totality of the circumstances of this case where the Tour Commander, in response to Ross' court refusals, rather than direct the assembly of an extraction team, activated

an alarm and ordered Willis to supervise a probe team to the area, it was not objectively unreasonable for Willis to believe that the Tour Commander had addressed contraindicator protocols.

Moreover, Ross was not only uncooperative, but actively resisted staff's efforts to handcuff him.  Accordingly, it is submitted that an officer placed in a situation under the facts and circumstances herein would not determine the actions of Captain Willis to be objectively unreasonable.  Accordingly, even if it is determined that there exists a factual dispute that a clearly established constitutional right was violated, Willis is protected by the doctrine of qualified immunity and summary judgment should be granted.

Plaintiff argues that the Court should decline to consider Willis' defense of qualified immunity concerning the deliberate indifference issue.  Defendant submits that said defense, i.e. qualified immunity, is sufficiently addressed herein and is subsumed both in this reply and in the opening memorandum concerning the excessive force claim and Willis' actions herein.  Defendant submits that it is appropriate for consideration by the Court for these reasons and/or in the Court's discretion.  Bayway Ref. v. Oxygenated Marketing & Trading, A.G., 215 F.3d 219, 226 (2d Cir. 2000).  Plaintiff addressed the qualified immunity issue in its opposition to both Willis and defendants George and Genoves.  Plaintiff can claim neither prejudice nor surprise herein.

Defendant Willis notes that such consideration by the Court would only become necessary should the Court, upon its review of the sufficiency/existence of a deliberate indifference claim, grant deference to plaintiff's pro se status, despite counsel's presence since February 11, 2020; determine that the claim has been sufficiently pled; and determine that a clearly established constitutional right had been violated.

14

Defendant Willis submits that no claim for deliberate indifference to medical needs has been pled and attaching excerpts from an investigator's report cannot cure this. Moreover, viewed under the totality of the circumstances herein, it cannot be said that Captain Willis' actions were objectively unreasonable.

Defendant Willis joins in the arguments of defendants George and Genoves to the extent applicable to this motion.

Accordingly, defendant Willis respectfully submits that his motion for summary judgment be granted.

Dated:  Mineola, New York
          January 30, 2021

                              Respectfully submitted,

                              FRANKIE & GENTILE, P.C.

                              _James G. Frankie_____

                              JAMES G. FRANKIE
                              Attorney for Defendant Willis
                              1527 Franklin Avenue
                              Mineola, New York  11501