UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANTOINE ROSS,

                                        Plaintiff,

            -v-

CAPTAIN DION WILLIS, CORRECTION OFFICER
GEORGE, SHIELD #732, CORRECTION OFFICER
GENOVES, SHIELD # 17683,

                                        Defendants.

---

16 Civ. 6704 (PAE) (KNF)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

Plaintiff Antoine Ross ("Ross") brings this action under 42 U.S.C. § 1983 alleging that,

while in pretrial detention on Rikers Island, defendants Captain Dion Willis ("Willis"),

Correction Officer Sadoc Genoves ("Genoves"), and Correction Officer Rochaurd George

("George") violated his constitutional rights. The incident in question occurred when defendants

entered Ross's cell so as to produce him for court. Willis sprayed Ross in the face with an MK-9

chemical agent, which, due to his asthma, caused him significant distress. Ross brings § 1983

claims against Willis for excessive force, against George and Genoves for failure to intervene,

and against all defendants for deliberate indifference to the risk of serious injury or illness.

Defendants now move for summary judgment on all claims. For the reasons that follow,

the Court denies defendants' motion as to the excessive force and failure intervene claims, which

will now proceed to trial. The Court grants defendants' motion as to the deliberate indifference

claims.

## I.      Background

### A.      Factual Background[1]

#### 1.      The Parties

On June 14, 2016, Ross was a pretrial detainee at Otis Bantum Correctional Center

("OBCC") at Rikers, and was being housed in 1 West, cell 30, within OBCC.  JSF ¶¶ 2–4.

1 West was designated as Enhanced Supervision Housing ("ESH"), which is used for inmates

who pose a security or safety risk to other inmates.  *Id.* ¶ 5; *see also* Frankie Decl., Ex. L (New

York City Charter, Title 40, Board of Correction § 1-16, Enhanced Supervision Housing).  Ross

was formerly a member of the Bullets, a gang affiliated with the Bloods.  Willis 56.1 ¶ 2; Ross-

---

[1] This factual account draws primarily from the parties' submissions on defendants' motions for summary judgment, including the Joint Statement of Undisputed facts, Dkt. 144 ("JSF"), defendants' Local Rule 56.1 statements, Dkts. 146-2 ("Willis 56.1"), 151 ("CO 56.1"), Ross's response to Willis's Rule 56.1 statement, Dkt. 183 at 1–11 ("Ross-Willis Counter 56.1"), Ross's response to Genoves's and George's Rule 56.1 statement, Dkt. 183 at 12–18 ("Ross-CO Counter 56.1"), Ross's Rule 56.1 statement of additional relevant facts, Dkt. 183 at 19–30 ("Ross 56.1"), defendants' Rule 56.1 reply statements, Dkts. 174 ("Willis Reply 56.1"), 178 ("CO Reply 56.1"), and the declarations (with accompanying exhibits) of James Frankie, Esq., Dkts. 146-3 ("Frankie Decl."), 172 ("Frankie Reply Decl."), Joshua Weiner, Esq., Dkts. 150 ("Weiner Decl."), 177 ("Weiner Reply Decl."), and Sarah Margolis, Esq., Dkt. 184 ("Margolis Decl.").  The Court also relies on a handheld video capturing some events at issue, Margolis Decl., Ex. 1 ("Video") (filed with the Court), and a joint stipulated transcript of the video, Dkt. 145 ("Video Tr.").

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Willis Counter 56.1 ¶ 2; Ross Tr.[2] at 173.  The parties dispute whether, as of June 14, 2016, Ross was still affiliated with the gang.  *See* Willis 56.1 ¶ 2; Ross-Willis Counter 56.1 ¶ 2.

Willis was appointed a Correction Officer on June 2, 2005, and was promoted to Captain on January 17, 2014.  Willis 56.1 ¶ 3; Ross-Willis Counter 56.1 ¶ 3.  On June 14, 2016, he was assigned to the OBCC command as intake captain.  JSF ¶ 2; Willis 56.1 ¶ 6; Ross-Willis Counter 56.1 ¶ 6.  George was appointed a Correction Officer on August 27, 2009.  Willis 56.1 ¶ 4; Ross-Willis Counter 56.1 ¶ 4.  CO Genoves was appointed a Correction Officer on November 10, 2005.  Willis 56.1 ¶ 5; Ross-Willis Counter 56.1 ¶ 5.  On June 14, 2016, George and Genoves were assigned to the OBCC command as intake correction officers in OBCC.  JSF ¶ 2; Willis 56.1 ¶ 6; Ross-Willis Counter 56.1 ¶ 6.

### 2.    Ross's Medical History

Ross was first diagnosed with asthma as a child.  JSF ¶ 6.  As an adult, Ross visited the emergency room multiple times as a result of his asthma symptoms, including in May 2013, January 2015, and June 2015.  *Id.* ¶ 7.

On January 29, 2016, after Ross entered DOC custody, DOC medical staff diagnosed him with "asthma with acute exacerbation" from having been exposed to a "chemical agent."  *Id.* ¶ 8.  Medical staff prescribed "Qvar 80 MCG/ACT Aerosol Solution," a "maintenance medication" that Ross was to take every day; Ross's medical records indicate that he was still prescribed this medication as of June 14, 2016.  *Id.* ¶¶ 9–10.  Ross was also prescribed an inhaler, a "rescue medication," which he was to carry with him at all times.  *Id.* ¶ 10.

---

[2] For simplicity, the Court collectively refers to all excerpts of Ross's deposition as "Ross Tr." *See* Frankie Decl., Ex. I; Weiner Decl., Ex. A; Margolis Decl., Ex. 2; Frankie Reply Decl., Ex. S.

On April 7, 2016, DOC mental health staff diagnosed Ross with depression, and, on May 6, 2016, prescribed him Remeron, which he had previously been prescribed for depression. *Id.* ¶ 11. Between May 12, 2016 and June 14, 2016, Ross was prescribed 45 mg of Remeron, to be taken at bedtime. *Id.* Larry Blackmore ("Blackmore"), a physician's assistant at DOC, *id.* ¶ 10, testified that Remeron can cause "drowsiness, fatigue, and dizziness," *id.* ¶ 12. Ross testified that, on the night of June 13, 2016, he had been given Remeron at "around sevenish, eightish" at night. *Id.* ¶ 13. Ross testified that the Remeron was given to him in the evening to help him sleep. *See* Ross Tr. at 59.

### 3.   DOC Use of Force and Prisoner Production Policies

DOC has developed policies related to use by its officers of force on inmates, use of chemical agents by DOC officers on inmates, and production of inmates to court. JSF ¶ 14; Frankie Decl., Ex. A ("DOC Prisoner Prod. Dir."); *id.*, Ex. B ("DOC Chemical Agents Dir."); *id.*, Ex. C ("DOC UOF Dir."). "DOC's policies, including directives, operations orders, and teletypes, are mandatory for all DOC personnel to follow, including members of probe teams." JSF ¶ 15.

As of June 14, 2016, DOC officers were required to intervene if they saw any officer, "including a captain, violating a DOC policy." *Id.* ¶ 16. Chief Kenneth Stukes ("Stukes"), DOC's 30(b)(6) witness, testified that all DOC officers receive training on use of force, anticipated use of force events, the use of chemical agents, and how to handle an inmate who refuses to go to court. Stukes Tr. at 52–53, 124–25, 161, 224–26.[3] All three defendants received such training. *See* Ross 56.1 ¶ 24; Willis Reply 56.1 ¶ 24; CO Reply 56.1 ¶ 24.

---

[3] For simplicity, the Court collectively refers to all excerpts of Stukes's deposition as "Stukes Tr." *See* Frankie Decl., Ex. F; Margolis Decl., Ex. 9.

On the date of a scheduled court appearance, OBCC staff usually wake up the inmate between approximately 4 a.m. and 5 a.m.; the inmate is given an opportunity to gather legal papers, eat breakfast, and shower before his appearance. *See* JSF ¶ 21; Willis 56.1 ¶ 11; Ross-Willis Counter 56.1 ¶ 11; *see also* Stukes Tr. at 50.  The buses that transport inmates to the courthouse typically arrive between 6 a.m. and 7 a.m., and continue to arrive throughout the day as necessary.  JSF ¶ 21.  Inmates are not required to wake up for breakfast.  *See* Monroe Tr.[4] at 85.  When an inmate refuses to go to court, the area supervisor is supposed to first determine whether the inmate's reason for refusal is one that is "recognized by an agency."  Stukes Tr. at 51; *see also* Ross 56.1 ¶ 39.[5]

An inmate refusing to go to court is an "anticipated use of force" event.  Stukes Tr. at 53; DOC UOF Dir. § IV.C.2.  When there is an anticipated use of force event in which an extraction is required, the supervising captain, before using force, should attempt to contact DOC mental health personnel.  Stukes Tr. at 20–26, 168–69; DOC UOF Dir. § V.A.2.  "If the opportunity presents itself," supervising captains are directed to maintain dialogue with tour commanders to determine whether an inmate has a "contraindicator," such as asthma, that would preclude use of chemical agents.  DOC UOF Dir. § IV.D; Stukes Tr. at 207–08 (asthma is contraindicator for use of chemical agents).

---

[4] For simplicity, the Court collectively refers to all excerpts of Monroe's deposition as "Monroe Tr."  *See* Frankie Decl., Ex. E; Weiner Decl., Ex. E; Margolis Decl., Ex. 7; Frankie Reply Decl., Ex. T.

[5] Willis disputes this statement on the grounds that this requirement is conditioned on the inmate's cooperation and that a probe team captain is not an area supervisor.  *See* Willis Reply 56.1 ¶ 39.  However, Willis's counter-statement does not include a citation to the record supporting these factual claims.

DOC policy designates use of hand-held chemical agents as a lesser degree of force than physical contact, *see* DOC Chemical Agents Dir., but it prohibits chemical agents from being used against inmates who have a contraindication to chemical agents, *see* Stukes Tr. at 22–26, 116–18, 225.  Officers who carry chemical agents receive annual training on their use, *id.* at 226, 232–33; Willis received such training, Willis Tr. at 22, 24, 29, 41.  Chemical agents are not supposed to be used at a distance under six feet.  Stukes Tr. at 219–20.

### 4.     Events of June 14, 2016

#### *a.     Ross's Initial Refusal to Go to Court*

On June 14, 2016, Ross had a scheduled court appearance in Bronx County, New York. JSF ¶ 22; Willis 56.1 ¶ 7; Ross-Willis Counter 56.1 ¶ 7; *see also* Margolis Decl., Ex. 10 (court record from the Supreme Court of New York, Bronx County).  Captain Latonia Monroe ("Monroe") testified that, that day, a correction officer informed her that Ross was refusing to go to court.  JSF ¶ 23; Monroe Tr. at 74, 84.  Monroe testified that, at approximately 6:40 a.m., she went to speak to Ross about why he was refusing to go to court, *see* JSF ¶ 24; Monroe Tr. at 74; Ross, however, does not recall interacting with Monroe at all that morning, *see* Ross Tr. at 55. Monroe testified that when she reached Ross's cell, she saw him lying on his bed, but could not recall in what position.  JSF ¶ 25; Monroe Tr. at 77–78.  She testified that she attempted to speak to him several times but that she was unable to get any information from Ross other than that he did not want to go to court.  Monroe Tr. at 77–80.  She eventually left Ross's cell to continue her work but testified that she made additional attempts to produce him for court.  JSF ¶ 27.  She also informed her tour commander of the issue.  *Id.* ¶ 28; *see also* Monroe Tr. at 79, 91.

Monroe testified that she later returned to Ross's cell to capture his refusal to go to court on video.  Monroe Tr. at 79, 91.  Monroe's use of force report for June 14, 2016 indicates that she returned to his cell with the camera at approximately 6:40 a.m.  Frankie Decl., Ex. G

("Monroe UOF Report").  This process is called "refusal on video."  Stukes Tr. at 69–70.  DOC captures inmate refusals to go to court on video to help them explain to the court why the inmate did not appear.  *Id.* at 70.  Monroe testified that Ross was not physically aggressive when she interacted with him and that she did not feel threatened by him.  Monroe Tr. at 94–95.

### b.  *Probe Team and Pepper Spray*

At approximately 7 a.m., an OBCC "probe team"—consisting of five officers, Willis, George, Genoves, and two non-party officers, Jordan and Phillips—arrived at Ross's cell to produce him for court.  JSF ¶¶ 29, 31.  A probe team consists of one captain and four officers at most.  *Id.* ¶ 30.

How the probe team came to be called to Ross's cell is in dispute.  Monroe testified that her tour commander, Assistant Deputy Warden Sharma Dunbar ("Dunbar"), activated an institutional alarm and dispatched the probe team, but she could not recall whether Dunbar did so before or after speaking to Monroe; Monroe testified that Dunbar could have been watching the situation unfold on the surveillance cameras.  Monroe Tr. at 95, 97.  Willis and Genoves testified that the probe team was called in response to an alarm.  *See* Willis Tr.[6] at 74; Genoves Tr.[7] at 69–70.  George did not recall hearing an alarm himself but testified that he might have heard from Willis that there was an alarm.  George Tr.[8] at 64–65.  However, per DOC policy, an extraction team, rather than a probe team, should have been assembled to address the situation.

---

[6] For simplicity, the Court collectively refers to all excerpts of Willis's deposition as "Willis Tr." *See* Frankie Decl., Ex. H; Weiner Decl., Ex. D; Margolis Decl., Ex. 3; Frankie Reply Decl., Ex. R; Weiner Reply Decl., Ex. N.

[7] For simplicity, the Court collectively refers to all excerpts of Genoves's deposition as "Genoves Tr."  *See* Weiner Decl., Ex. C; Margolis Decl., Ex. 4; Frankie Reply Decl., Ex. Q.

[8] For simplicity, the Court collectively refers to all excerpts of George's deposition as "George Tr."  *See* Weiner Decl., Ex. B; Margolis Decl., Ex. 5.

*See* Stukes Tr. at 257–58. An extraction is a planned event, *id.* at 168, one that a probe team could not execute without assembling an extraction team, *id.* at 130. In such an event, Stukes testified, it was the captain's job to contact mental health personnel and medical personnel to request contraindicators, *id.* at 168–69.[9]

The probe team wore "protective vests, helmets, and gas masks." JSF ¶ 33. Willis wore a white helmet and a vest numbered 064; Genoves wore a vest numbered 028; and George wore a vest numbered 026. *Id.* Phillips operated a handheld video camera and captured some video and audio of the events at issue. *See* JSF ¶ 32; *see also* Video. However, due to Phillips's position relative to Ross's cell, much of the video is obscured by probe team officers, and some of the audio is unintelligible. *See* Video; Video Tr.

When the probe team arrived at Ross's cell, Willis, George, and Genoves entered; Jordan stood inside the cell near the doorway, and Phillips stood in the back with the video camera. JSF ¶ 34; Video. Ross was lying face-down on his bed. JSF ¶ 35; Willis Tr. at 81. Ross testified that he was awoken when the officers entered his cell. Ross Tr. at 55, 63. Willis and George told Ross that they needed to take him out of the cell for his court appearance. *See* JSF ¶ 37; Video at 0:31–0:56; Video Tr. at 0:31–0:56. Ross replied that he was "going to sleep" and told the officers "do not touch me bro, do not touch me, bro." Video at 0:59–1:03; Video Tr. at 0:59–1:03. Willis again told Ross that he needed to leave the cell. Video Tr. at 1:03–1:05. Willis told someone on the probe team to "grab him." *Id.* at 1:06–1:10.

Either George or Genoves (or both) attempted to grab Ross's arm to place him in handcuffs. JSF ¶ 40. Ross again told the officer not to touch him. *Id.*; Video Tr. at 1:05. Ross

---

[9] Willis argues that this statements conflicts with the DOC's UOD Directive, but does not point to specific contradictions in the directive. *See* Willis Reply 56.1 ¶ 32.

testified that he was trying to tell the officers that because he had been given a sedative, he was unable to get up. Ross Tr. at 57, 101, 118. He further testified that although he understood that he could not refuse to go to court, he did not intend to refuse to go at all; rather, his sedative prevented him from getting up. *See id.* at 207. On the video, Ross can be heard saying, "Grabbing me . . . grabbin' my arm while I'm on drugs, boy. . . . What's wrong with you, boy? Is you crazy? . . . What's wrong with you, son?" Video at 1:10–1:14; Video Tr. at 1:10–1:14.

The parties dispute whether, during this time, Ross resisted the officers' attempts to handcuff him. Ross recalled that someone was tugging on his arm, but he did not remember whether he pulled his arm away. Ross Tr. at 101–03. Willis testified that after instructing staff to grab Ross's arms, Ross pulled his arm away. Willis Tr. at 89.

Willis then told Ross that he "need[ed] to take [Ross] out or [he was] gonna spray [Ross]." Video Tr. at 1:14–1:21. Willis told Ross he was going to give him "one opportunity." *Id.*; JSF ¶ 41. Ross asked, "Spray me for what?" Video Tr. at 1:22–1:23. Willis told him it was "[f]or [Ross] to come out." *Id.* at 1:24–1:25. George and Genoves testified that they heard Willis tell Ross he was going to spray him if Ross did not comply. JSF ¶ 42. George testified that at this time, he was not certain that Willis actually would spray Ross, because sometimes inmates comply after being warned that they may be sprayed, and sometimes they do not. George Tr. at 146–47.

Ross then stated: "Y'all niggas is crazy son. Y'all niggas is crazy." Video Tr. at 1:26–1:30. Approximately one second later, Willis sprayed Ross once in the face with MK-9 handheld chemical agent ("pepper spray" or "OC spray"). *Id.* at 1:30–1:31; JSF ¶ 44. Willis told the other officers to "[c]uff him," Video Tr. at 1:32. George handcuffed Ross using flex cuffs, JSF ¶ 45.

Willis testified that he did not consider Ross's refusal to go to court an "emergency." Willis Tr. at 86.  He further testified that he did not at any point think that Ross was a threat to himself, other inmates, Willis himself, or other members of the probe team, *id.* at 130, and that he "did not spray [Ross] because he was a threat," *id.* at 169.  However, Willis did testify that, in general, he views all inmates as threats, in particular when responding to an area as an alarm supervisor.  *Id.* at 85.  George did not consider Ross a threat to himself, but testified that he did not know whether Ross was a threat to others.  George Tr. at 114–15, 122–23.  Genoves testified that he felt Ross was "somewhat of a threat" in the sense that he did not know what Ross's "intentions" were in allegedly failing to comply with the officers' orders.  Genoves Tr. at 88–89.  However, although he "did not want to get hurt," Genoves testified that he would "not . . . say threatened personally," *id.* at 89, and he did not feel that Ross was a threat to other inmates or himself, *id.* at 91, 120.  When asked whether Willis sprayed Ross "even though [Ross] was not a threat," Genoves answered, "Correct."  *Id.* at 123.

Approximately 25 seconds after Willis sprayed him, Ross told the officers that he was asthmatic.  Video Tr. at 1:58; JSF ¶ 46.  All three defendants testified that they had not been aware of Ross's medical history or his history of asthma.  JSF ¶ 36.  Probe teams are not generally informed about patients' medical histories or conditions, *see* Stukes Tr. at 158–59, but captains can request, and in non-emergency anticipated-use-of-force scenarios should request, contraindicators to chemical agents, *see id.* at 24, 116–18, 168–69.  Ross testified that it "slipped [his] mind" to tell the officers that he was asthmatic before being sprayed because he "was just more worried about the fact that [the officers were] spraying him . . . ."  Ross Tr. at 185.

The probe team escorted Ross out of his cell toward the intake area.  JSF ¶ 47; Video at 2:30–5:43.  On the video, Ross can be heard gasping for air.  Video at 2:31–3:31.  While walking

down a halfway, led by officers, Ross told the officers, "I can't breathe.  I can't breathe."  *Id.* at
3:44–49; JSF ¶ 48.  Approximately 20 seconds later, Ross again told the officers he could not
breathe.  Video at 4:08; Video Tr. at 4:08; JSF ¶ 49.

The officers then lifted Ross, put him on a gurney, and wheeled him the rest of the way to
the intake area.  Video at 4:11–5:43; JSF ¶¶ 50–51.  Ross waited face-down on the gurney for
several minutes while the probe team obtained the keys to the decontamination shower.
JSF ¶¶ 52–53; Video at 5:44–7:22.  Ross testified that during this time, he experienced
symptoms similar to those he has experience during asthma attacks, including trouble breathing,
tightness in his chest, and pain.  Ross Tr. at 70–71, 116.  The video reflects that, less than a
minute after arriving in the intake area, Ross began shaking and coughing.  Video at 6:15.
Phillips then told the officers to turn Ross on his side.  *Id.* at 6:30–6:34; Video Tr. at 6:30–6:34.

At 7:22 of the video, the probe team obtained the keys to the decontamination shower.
Video at 7:22; JSF ¶ 52.  Ross was gasping and screaming as he was taken to the
decontamination shower.  Video at 7:22–8:18.  Genoves and Jordan lifted Ross off the gurney
and put him in the shower.  JSF ¶ 54.  Genoves then cut off Ross's flex cuffs and told him to
walk to the back of the shower and push the button to turn the shower on.  *Id.* ¶ 55; Video at
9:01–9:21.  Ross testified that although the decontamination shower did not eliminate all effects
of the OC spray, it did help with the most "extreme effects"; he then told an officer that he felt
"relieved" and "would like to see medical."  Ross Tr. at 75–76.

### c.   *Ross's Medical Treatment and Injuries*

At approximately 10:20 a.m., Ross was seen at the medical clinic by DOC physician's
assistant Larry Blackmore ("Blackmore").  JSF ¶ 57; *see also* Margolis Decl., Ex. 11 ("Ross
Injury Report").  The injury report indicates that Ross presented to the clinic in "no distress," that
no chemical agent was present, and that "no injury [was] noted."  Ross Injury Report; JSF ¶ 58.

11

Ross testified that he did not receive treatment at the medical clinic, although Blackmore examined him.  Ross Tr. at 82–83; Ross Injury Report ("No treatment indicated.  Patient education on injury given.").

Ross testified that he continues to experience emotional distress as a result of this incident, which has contributed to his depression.  Ross Tr. at 119, 121; 203.

After his examination at the medical clinic, Ross was taken to his scheduled court appearance.  JSF ¶ 60.

### 5.    DOC Investigation of Probe Team's Actions

Although a report created by Stukes and Dunbar concluded that "[f]orce was required and unavoidable," Frankie Decl., Ex. M, DOC conducted a separate investigation into the events of June 14, 2016, *see* Ross 56.1 ¶ 105; Willis Reply 56.1 ¶ 105; CO Reply 56.1 ¶ 105; *see also* Margolis Decl., Ex. 14 ("Longi Report").  Willis was interviewed as a part of the investigation. JSF ¶ 62.  The investigation concluded that Willis was aware that this was a use of force scenario and that he "violated the anticipated UOF directive by not assembling a proper extraction team, not notifying mental health services and never requesting contra indicators from the on duty tour commander for Inmate Ross prior to utilizing chemical agents."  Longi Report at 8.  The investigation also concluded that Ross's asthma diagnosis "would have prevented Captain Willis from being able to use chemical agents as a means to gain compliance from Ross."  *Id.*

Through a negotiated plea agreement, Captain Willis pled to charges that he violated the DOC's UOF Directive and chemical agents policy.  *See* Margolis Decl., Ex. 16.

### B.    Procedural History

On August 25, 2016, Ross, proceeding *pro se*, filed the complaint naming New York City, Captain Willis, and three John Doe officers as defendants. Dkt. 2.  On May 11, 2017, the Court directed the New York City Law Department to give Ross the identities of the John Doe

defendants.  Dkt. 12.  On June 2, 2017, Ross filed an amended complaint including three John

Doe defendants.  Dkt. 14.  On June 26, 2017, the Court referred the case to Magistrate Judge Fox

for general pretrial supervision.  Dkt. 20.  The Court also ordered Ross to file a second amended

complaint naming the John Doe defendants.  Dkt. 21.

On August 24, 2017, Judge Fox granted the City's motion to stay the case pending a

DOC investigation of Ross's allegations.  Dkt. 28.  On November 1, 2017, Ross filed a second

amended complaint which named the individual officers.  Dkt. 34.  On November 14, 2017, the

City filed a motion to dismiss Ross's claims against it.  Dkts. 35–36.  On December 28, 2017,

Ross filed a third amended complaint, Dkt. 39, and on January 5, 2018, a fourth amended

complaint, Dkt. 40.

On November 14, 2018, the Court directed defendants to inform the Court whether, in

light of the fourth amended complaint, they intended to rely on their original motion to dismiss,

and to notify the Court if there was a reason the stay should not be lifted.  Dkt. 44.  On

November 20, 2018, the City informed the Court that it intended to rely on its original motion to

dismiss, Dkt. 45; the Court lifted the stay, Dkt. 47.  The Court referred the pending motion to

dismiss to Judge Fox for a report and recommendation.  Dkt. 46.

Ross opposed the City's motion to dismiss through the series of letters dated December 3,

2018, Dkt. 51, December 17, 2018, Dkt. 49, and December 22, 2018, Dkt. 50.  On March 11,

2019, Judge Fox issued the Report, recommending that the Court grant the motion to dismiss.

Dkt. 52.  After receiving no objections, the Court adopted the Report and dismissed all claims

against the City.  Dkt. 54.

On April 1, 2019, Willis answered the fourth amended complaint, including a cross-claim

against the City for indemnification, alleging that any injuries to Ross had been caused by the

wrongdoing or negligence of the City and its agents.  Dkt. 58.  On April 3, 2019, Ross filed the fifth amended complaint.  Dkt. 59.

On April 15, 2019, Ross filed an application for the Court to request pro bono counsel. Dkt. 60.  The same day, the City answered Willis's cross-claim.  Dkt. 62.  On April 17, 2019, the City moved to dismiss the fifth amended complaint, Dkts. 63–65.

On April 29, 2021, Ross filed objections to the Report, Dkt. 67, and on May 7, 2019, wrote a letter to the Court explaining why he had not been able to object on time, Dkt. 69, and filed a motion seeking "reinstatement" of his case, Dkts. 71–72.  On May 9, 2021, this Court construing Ross's objections as a motion for reconsideration, denied Ross's motion.  Dkt. 73.

On September 23, 2019, Judge Fox granted Ross's application for pro bono counsel. Dkt. 78.  On September 27, 2019, Willis answered the Fifth Amended Complaint, Dkt. 79, and on October 3, 2019, George and Genoves answered, Dkt. 82.

On February 11, 2020, pro bono counsel appeared on Ross's behalf.  Dkts. 107–09. Following the close of discovery, which Judge Fox continued to supervise, the remaining defendants—Willis, George, and Genoves—filed letters indicating that they intended to move for summary judgment.  Dkts. 134–35.  On November 3, 2020, Ross filed letters indicating that he would oppose both motions.  Dkts. 137–38.

On November 23, 2020, the Court held a pre-motion conference.  On December 10, 2020, the parties filed the JSF and the joint stipulated transcript of the video taken on June 14, 2016.  Video Tr.  On December 21, 2020, Willis filed a motion for summary judgment.  Dkt. 146, 146-1 ("Willis Mem.").  On December 24, 2020, George and Genoves filed a motion for summary judgment.  Dkts. 149, 152 ("CO Mem.").  On January 14, 2021, Ross filed a consolidated opposition to the motions.  Dkt. 157.  On January 29, 2021, the Court ordered that

Ross re-file his opposition and supporting documents without redactions, except as to Willis's disciplinary history. Dkt. 170; *see also* Dkt. 182 ("Ross Opp'n"). On January 30, 2021, Willis filed a reply, Dkt. 171 ("Willis Reply"), and on February 1, 2021, George and Genoves filed a reply, Dkt. 176 ("CO Reply"). On February 4, 2021, counsel for Ross filed a corrected declaration that included pages inadvertently omitted from the original declaration. Margolis Decl.

## II.    Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required

to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.   Discussion

Ross brings three sets of claims under § 1983: (1) an excessive force claim against Willis; (2) a failure to intervene claim against George and Genoves; and (3) a claim for deliberate indifference against all three officers.

### A.   Excessive Force

Willis moves for summary judgment on the claim against him for using excessive force.

#### 1.   Legal Standards

##### a.   *Objectively Unreasonable Force*

Section 1983 provides redress for the deprivation of federally protected rights by persons acting under color of state law.  42 U.S.C. § 1983.  To prevail on a § 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978).

"While the Eighth Amendment's protection does not apply 'until after conviction and sentence,' the right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment[.]"  *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (citation omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989)).  Excessive force claims under the Eighth and Fourteenth Amendments are subject to different standards.  In contrast to such claims brought under the Eighth Amendment,

"a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015).[10]

Whether the force used was objectively unreasonable "turns on the facts and circumstances of each particular case," and is to be evaluated "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* at 397 (cleaned up).  The Supreme Court has identified a number of non-exclusive factors that bear on the reasonableness of force used: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*  Consistent with the "fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

Because running a prison "is an inordinately difficult undertaking," *Kingsley*, 576 U.S. at 399 (cleaned up), courts must "afford prison officials some latitude to make 'good-faith effort[s] to maintain or restore discipline,'" *Taylor v. Nieves*, No. 17 Civ. 7360 (AJN), 2020 WL 7028907, at *2 (S.D.N.Y. Nov. 30, 2020) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997)).

---

[10] The Second Circuit previously required pretrial detainees asserting excessive force claims "satisfy two requirements: the 'subjective requirement' that a defendant had a 'sufficiently culpable state of mind' and the 'objective' requirement that the 'deprivation alleged is objectively sufficiently serious or harmful enough.'"  *Carmona v. City of New York*, No. 13 Civ. 3273 (WHP), 2016 WL 4401179, at *2 (S.D.N.Y. Mar. 1, 2016) (quoting *Walsh*, 194 F.3d at 49–50).  However, in *Kingsley*, the Supreme Court removed the subjective component for pretrial detainees.  576 U.S. at 396–97.

And "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a [plaintiff's] constitutional rights." *Mesa v. City of New York*, No. 09 Civ. 10464 (JPO), 2013 WL 31002, at *18 (S.D.N.Y. Jan. 3, 2013) (cleaned up).

> b.    *Qualified Immunity*

Qualified immunity "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012).  Its purpose is to "give government officials breathing room to make reasonable but mistaken judgments" and to protect "all but the plainly incompetent or those who knowingly violate the law." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (cleaned up).

A constitutional right was clearly established if, at the time of the officer's conduct, "the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (cleaned up).  The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* at 590 (quotation omitted). Although a "case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Fabrikant v. French*, 691 F.3d 193, 213 (2d Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  The clearly established right "must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019).  Defining the right as "right to be free of excessive force" is "far too general." *Id.* "Even if the right at issue was clearly established in certain respects, . . . an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the

18

action at issue in its particular factual context." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Summary judgment should be granted on the basis of qualified immunity only if "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[], could conclude that it was objectively reasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (cleaned up).

Because qualified immunity is an affirmative defense, defendants bear the burden of proof. *See Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011).

### 2.   Application

 "The use of pepper spray 'constitutes a significant degree of force' and can in certain cases form the basis of a constitutional violation." *Quinones v. Rollison*, No. 18 Civ. 1170 (AJN), 2020 WL 6420181, at *4 (S.D.N.Y. Nov. 1, 2020) (quoting *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010)); *see also Tracy*, 623 F.3d at 98 ("Unquestionably, infliction of pepper spray on an arrestee has a variety of incapacitating and painful effects[.]").  Here, viewing the evidence in the light most favorable to Ross, a reasonable factfinder could conclude that Willis's use of pepper spray was objectively unreasonable and hence an excessive use of force.

First, there is no genuine dispute that Ross did not present a threat to the probe team, other inmates, or even himself.  All three officers testified that they did not personally feel threatened by Ross, *see* Willis Tr. at 130; George Tr. at 114–15, 122–23; Genoves Tr. at 89; all three further testified that he was not a threat to himself, *see* Willis Tr. at 130; George Tr. at 114; Genoves Tr. at 120; Willis and Genoves testified that he was not a threat to the other probe team members, *see* Willis Tr. at 130; Genoves at 120; and Willis and Genoves testified that Ross was not a threat to other inmates, *see* Willis Tr. at 130; Genoves Tr. at 91.

To be sure, notwithstanding this testimony, Willis also testified that generically he views all inmates, particularly those in ESH, as threats. *See* Willis Mem. at 16; Willis Tr. at 85 (Willis views all inmates as threats, particularly when responding to an alarm). And Genoves testified that Ross was "somewhat of a threat" because he "did not know [Ross's] intentions." CO Mem. at 3; *see also id.* at 11 (arguing that the "need to use force was high as [Ross], a maximum security inmate, repeatedly refused verbal orders . . . then escalated his resistance"). But these generalized arguments reach too far. To find that Ross present an imminent threat to officers solely because of his status as an ESH detainee "would place few restrictions on officers' treatment of individuals with extensive disciplinary records" or those in ESH. *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 255 (2d Cir. 2020).

In any event, the officers' testimony makes clear that, whatever concerns they generically have as to detainees in the ESH, these played no role in the decision here. Willis, who made the decision to use the pepper spray, unequivocally testified that he did not spray Ross based on the view that Ross posed a threat, *see* Willis Tr. at 169, and that he never viewed Ross a threat to himself or others:

> Q: At any point during the incident was Mr. Ross a threat?
>
> A: No.
>
> Q: Did you feel he was a threat to the other members of the probe team?
>
> A: No.
>
> Q: Did you feel he was a threat to himself?
>
> A: No.
>
> Q: Did you feel he was a threat to other inmates?
>
> A: No.

Willis Tr. at 130. Genoves also testified multiple times to the same effect:

Q: At this point [when Ross said "don't touch me bro"] did you think he was a physical threat to you?

A: No.

Q: Did you think he was a physical threat to the other members of the probe team?

A: No. . . .

Q: Was he a physical threat to himself?

A: No. . . .

Q: . . . And so Captain Willis talked to Mr. Ross for about a minute and four seconds before he sprayed Mr. Ross with a chemical agent, correct?

A: Correct.

Q: And that was even though he was not a threat, correct?

A: Correct.

Genoves Tr. at 120, 123 (objections omitted).

Second, there is a genuine dispute as to whether and to what degree Ross resisted the probe team's one or more attempts to handcuff him. The only evidence to which defendants point in support of their argument that Ross actively resisted being handcuffed is Willis's testimony that, at one point, he instructed the probe team to grab Ross's arms, and Ross "pulled away and said don't fucking touch me." Willis Tr. at 89.[11]  Ross, for his part, testified that although he remembers that someone from the probe team touched him, he cannot remember whether he pulled his arm away. Ross Tr. at 101–03. Defendants are correct that, in general, a party's inability to recall certain events is not sufficient to raise a genuine dispute of fact. *See Creighton v. City of New York*, No. 12 Civ. 7454 (PGG), 2017 WL 636415, at *40 (S.D.N.Y.

---

[11] Willis asserts that it is undisputed that Ross pulled away multiple times, *see* Willis 56.1 ¶ 28 ("Members of the probe team took hold of Inmate Ross' wrist in an effort to handcuff him, but each time Ross pulled away . . . ."), but that is not supported by the citation to Willis's deposition, *see* Willis Tr. at 89.

Feb. 14, 2017); *Faruki v. City of New York*, No. 10 Civ. 9614 (LAP), 2012 WL 1085533, at *5

(S.D.N.Y. Mar. 30, 2012).  But that principle does not carry the day here.  Ross attests that he

had been given medication by DOC at night in part to help him sleep, *see* JSF ¶ 13; Ross Tr. at

59, which appears to have affected his ability to stay alert during his encounter with defendants.

And jury could credit that pepper spray was used on Ross—as is undisputed—while choosing to

disbelieve Willis's uncorroborated description of Ross's as having pulled his arm away.  In any

event, as Ross notes, even if it were undisputed that Ross had "pulled away" a single time when

officer(s) grabbed him, a reasonable jury could conclude that that was not an act of or signifying

actively resistance.  *See Brown v. City of New York*, 798 F.3d 94, 103 (2d Cir. 2015) (denying

summary judgment on excessive force claim where plaintiff refused to put her hands behind her

back to be handcuffed because this "non-threatening form of resistance" was "only one factor to

be considered").  Moreover, as the video reflects, Ross told the officers prior to the application of

peppers spray that he was "on drugs."  Video Tr. at 1:10–1:11.  A jury could infer that a

reasonable officer would have understood that Ross might be inhibited in his ability to comply

with the officers' commands.

Although not themselves accused of using excessive force, George and Genoves make

arguments bearing on this claim, in light of the derivative claims (for deliberate indifference and

failure to intervene) brought against them.  The cases on which they rely, however, are factually

inapposite.  In *Frost*, the Second Circuit upheld a grant of summary judgment to the defense on

an excessive force claim in which the plaintiff "resisted the officers and tried to prevent them

from entering the area where he was located by holding the door shut with his arm."  980 F.3d at

256.  In *Berman v. Williams*, No. 17 Civ. 2757 (JGK), 2019 WL 4450810 (S.D.N.Y. Sept. 17,

2019), the use of pepper spray was found objectively reasonable because the plaintiff's refusal to

comply with orders to remove his clothes and his "continual[]" physical resistance presented a security risk. *Id.* at *6–7. And in *Vazquez v. Spear*, No. 12 Civ. 6883 (VB), 2014 WL 3887880 (S.D.N.Y. Aug. 5, 2014), the plaintiff, who was in the inmate waiting room awaiting a court appearance, physically resisted being handcuffed by crouching down, and continued to resist officers' attempts to handcuff him. *Id.* at *4.[12] The plaintiff in each of these three cases thus physically resisted the officers and presented a greater security risk to them than did Ross. That is clearly so if one credits Ross's factual account, as required here. Even crediting the officers' accounts, the plaintiff-inmate's acts of resistance in *Frost*, *Berman*, and *Vasquez* exceeded that here.

The video does not alter this outcome. Defendants depict the video as making clear that Ross was actively, physically resisting. *See* Willis Reply at 3; CO Reply at 9–10. Not so. It is undisputed that, prior to the use of pepper spray, one or more of the officers touched Ross once, in response to which he told the officers not to touch him. *See* Willis Tr. at 89; Ross Tr. at 101 (conceding that one or more officers must have touched him). It is further undisputed, and the audio component on the video reflects, that Ross told the officers multiple times not to touch him. *See* Video Tr. at 0:59–1:05. But Ross's actions during this period are all but fully obscured on the video by the probe team. Although the video thus does not preclude the possibility that the obscured Ross resisted in some fashion, there is no footage of Ross resisting once, let alone multiple times. And the audio evidence is as compatible with Ross's explanation that he was

---

[12] Importantly, *Vazquez* was decided before to the Supreme Court's decision in *Kingsley* eliminating the subjective prong of the excessive force standard. It thus relied on the fact that the officers' use of pepper spray had not been "malicious and sadistic" or in "bad faith." 2014 WL 3887880, at *4.

using loud words alone to induce the officers to ease up—to explain that he was sedated, Ross

Tr. at 101–03—as it is with defendants' narrative that Ross resisted attempts to handcuff him.

Third, the distance from which the OC spray was used on Ross may enhance his claim of

excessive force.  *See Tracy*, 623 F.3d at 98 (denying summary judgment in part based on factual

dispute about distance from which the pepper spray was deployed).  Here, the parties dispute the

distance between Willis and Ross at the moment Ross sprayed Willis.  Willis testified that he

was about six feet from Ross, *see* Willis Tr. at 151, but Monroe testified that there were only

three to four feet between the door and Ross's bed, *see* Monroe Tr. at 79, appearing to narrow

the potential space between them by several feet.

Fourth, at summary judgment, Ross's injuries are sufficient to sustain an excessive force

claim.  Defendants argue that because Ross did not sustain more serious injuries, his excessive

force claim must fail.  *See* Willis Mem. at 14; CO Mem. at 12–13.  But the case law cautions

wariness about granting summary judgment on this basis, on the ground that, if injuries of

"limited duration" were enough to defeat an excessive force claim, "police and corrections

officers would essentially be able to utilize pepper spray and similar chemical agents with

impunity."  *Lewis v. Clarkstown Police Dep't*, No. 11 Civ. 2487 (ER), 2014 WL 1364934, at *6

(S.D.N.Y. Mar. 31, 2014), *adhered to on reconsideration*, No. 11 Civ. 2487 (ER), 2014 WL

6883468 (S.D.N.Y. Dec. 8, 2014).  Critical here, a plaintiff need not have sought medical

attention to support an excessive force claim.  *See Hodge v. Village of Southampton*, 838 F.

Supp. 2d 67, 77 (E.D.N.Y. 2012) ("The fact that plaintiff did not require substantial medical

treatment at the hospital following the incident does not necessarily mean that [defendant] is

entitled to summary judgment.").  And "[i]f the force used was unreasonable and excessive, the

plaintiff may recover even if the injuries inflicted were not permanent or severe."  *Robison v.*

24

*Via*, 821 F.2d 913, 924 (2d Cir. 1987).  Here, on the video, Ross can be heard gasping for air, *see* Video at 2:31–3:31, and stating multiple times that he could not breathe, Video Tr. at 3:44–49, 4:08.  He also testified that he experienced symptoms akin to those in an asthma attack.  *See* Ross Tr. at 70–71, 116.  That Ross was relieved by the decontamination shower and that his medical report showed, several hours later, that he was no longer in distress does not entitle defendants to summary judgment.  *See Lewis*, 2014 WL 1364934, at *6.

Accordingly, the undisputed facts, coupled with genuine issues of material fact, preclude granting Willis summary judgment on Ross's excessive force claim against him.  *See Tracy*, 623 F.3d at 98 ("[A] reasonable juror could find that the use of pepper spray deployed mere inches away from the face of a defendant already in handcuffs and offering no further active resistance constituted an unreasonable use of force[.]"); *Lewis*, 2014 WL 1364934, at *6 (S.D.N.Y. Mar. 31, 2014) (denying summary judgment where the parties disputed what triggered the plaintiff's behavior in the holding cell and the amount of pepper spray used).

Nor, viewing the undisputed facts in the light most favorable to Ross, is Willis entitled to summary judgment on the basis of qualified immunity.  Willis notes case law holding that, as of 2020, it had not been "clearly established that pepper spraying an uncooperative inmate is unlawful."  *Ismael v. Charles*, No. 18 Civ. 3957 (GHW), 2020 WL 4003291, at *11 (S.D.N.Y. July 15, 2020).  Accordingly, he argues, this right necessarily had not been clearly established as of June 14, 2016, the date of the incident.  *See* Willis Mem. at 12.  That argument, however, presupposes, factually, that prior to being sprayed, Ross was behaving "uncooperative[ly]," as addressed in *Ismael*.  There, although the inmate was not "physically resist[ing] or threaten[ing] any of the officers," *Ismael*, 2020 WL 4003291, at *11, he refused to enter an isolation cell after having been ordered to do so, *see id.* at *1–2 (explaining that officers needed to secure Ismael to

enable them to respond to a simultaneous, independent institutional alarm). By contrast, here Ross was secured in his cell, lying face down, threatening no one, and, on his version of events, not defying the officers at all,[13] and, as Willis acknowledges, the need to remove Ross from his cell for his court appearance was not an "emergency." Willis Tr. at 86.

George and Genoves argue that there is "no Supreme Court or Second Circuit case law clearly establishing that a corrections officer who deploys a single, short, two-second burst of chemical agent on an unrestrained asthmatic inmate when the inmate physically resisted and repeatedly refused to comply with legitimate orders to be produced to court is objectively unreasonable." CO Mem. at 23. But even accepting this extremely narrow formulation of the right, the Court has found genuine issues of fact as to whether Ross did pull his arm away a single time, and if so, whether Ross was physically resisting. And, with the exception of *Ismael*, addressed above, each case in which pepper spraying was held objectively reasonable to which defendants point involved physical resistance, *see Frost*, 2019 WL 4512620, at *2 (S.D.N.Y. Sept. 18, 2019) (plaintiff "continue[d] physically to resist" throughout the encounter); *Vazquez*, 2014 WL 3887880, at *4 (inmate physically resisted being handcuffed by crouching down, and continued to resist officers' attempts to handcuff him), or an individual suspected of a violent crime, *see Scoma v. City of New York*, No. 16 Civ. 6693 (KAM) (SJB), 2021 WL 230295, at *12 (E.D.N.Y. Jan. 22, 2021) (officers entitled to qualified immunity for pepper spraying an "unrestrained individual actively resisting arrest for domestic violence, where the officers

---

[13] George and Genoves argue that the fact that no officer thought Ross was a threat is irrelevant to the qualified immunity analysis because, after *Kingsley*, the operative test is objective, not subjective. *See* CO Reply at 10 n.9. But that no defendant found Ross threatening is germane to whether Ross was not resisting, which is germane to whether Willis, in spraying Ross, acted in a fashion that violated a clearly established right.

reasonably believed that such individual was dangerous"), *report and recommendation adopted*, No. 16 Civ. 6693 (KAM) (SJB), 2021 WL 1784385 (E.D.N.Y. May 4, 2021). *Brown v. City of New York*, 862 F.3d 182 (2d Cir. 2017), in which the Second Circuit found that the officers were entitled to qualified immunity for their use of physical force and repeated use of pepper spray, comes closer, but still involves an unrestrained arrestee who refused, even after being knocked to the ground, to offer her hands for handcuffing. *Id.* at 189.

By contrast, it was well-established as of June 2016 that "no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee." *Tracy*, 623 F.3d at 99 n.5; *see also id.* (it is well-established "that the use of entirely gratuitous force is unreasonable and therefore excessive"). Although Ross was unrestrained and an inmate, he was confined to his cell, lying face-down and, crediting Ross's version of events, passive and unable to comply with the officers' commands. And there are factual disputes that bear on whether Willis's use of force was gratuitous here, including whether he reasonably should have appreciated that Ross was drugged and unable to assist in being handcuffed or comply with the directive to leave to go to court, and whether Ross resisted the officers.

Instructively, a court in this District in *Lewis* found that factual disputes about the cause of plaintiff's disruptive behavior in the holding cell and the amount of OC gel used precluded summary judgment on qualified immunity grounds. *See* 2014 WL 1364934, at *10. Defendants argue that *Lewis* is distinct because the plaintiff was "confined to his cell," while Ross was "actively resisting, making threats, flouting commands, and was unrestrained." CO Reply at 12–13. But Ross was similarly confined to his cell, and defendants say-so in their memorandum of law notwithstanding, there is no evidence, let alone undisputed evidence that Ross was

27

"making threats" of any kind, and the video does not reveal any such defiance. *See* Video Tr. at 0:37–1:30.  In such circumstances, as *Ismael* recognized, courts in this District have denied motions for summary judgment where "a jury could find, in accordance with [p]laintiff's version of the events, that it was unreasonable for [defendant] to have used pepper spray on [p]laintiff while [p]laintiff was locked inside of his cell and neither physically resisting [defendant] nor posing an immediate threat." *Wiggan v. NYC Dep't of Correction*, No. 12 Civ. 1405 (GBD) (HBP), 2014 WL 4631456, at *2 (S.D.N.Y. Sept. 16, 2014) (adopting report and recommendation in its entirety); *Wiggan*, No. 12 Civ. 1405 (GBD) (HBP), Dkt. 46 (S.D.N.Y. Aug. 21, 2014) ("The decisions that have considered whether the use of pepper spray . . . on incarcerated individuals can constitute excessive force have [led] to mixed results. . . . [But] the cases seem to turn on whether the pepper spray . . . was used . . . to cause an inmate to cease engaging in dangerous or disruptive conduct." (collecting cases)), *report and recommendation adopted*, No. 12 Civ. 1405 (GBD) (HBP), 2014 WL 4631456 (S.D.N.Y. Sept. 16, 2014); *see also Ismael*, 2020 WL 4003291, at *11 n.8 (although district court opinions cannot create "clearly established" law, they may be "relevant to the qualified immunity analysis if they signal that preexisting law Supreme Court or Second Circuit cases foreshadowed a ruling on an issue").

To be sure, the availability of qualified immunity remains an open issue in this case.  At trial, Willis will be at liberty to ask that, in the event of a plaintiff's verdict, the jury make factual findings germane to the existence of qualified immunity (*e.g.*, whether Ross resisted and, if so, in what manner), so as to enable a determination on a clear factual record as to whether the facts justified Willis's use of a chemical agent.  *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990) (where factual disputes preclude "early disposition of the [qualified immunity] defense, the jury

should decide these issues on special interrogatories"); *see also Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003).

### B.      Failure to Intervene

George and Genoves next pursue summary judgment on Ross's § 1983 claim against them for failure to intervene to stop Willis from engaging in excessive force towards him.

#### 1.      Legal Standards

An officer can be held liable under § 1983 for "the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that: (1) excessive force is being used, (2) a citizen has been unjustifiably arrested, or (3) any constitutional violation has been committed by a law enforcement official." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted). A plaintiff cannot succeed on a claim for failure to intervene under § 1983 when there is no underlying constitutional violation. *Wieder v. City of New York*, 569 Fed. App'x 28, 30 (2d Cir. 2014) (summary order) ("Because the underlying constitutional claims were properly dismissed, we also affirm the district court's dismissal of plaintiff's failure to intervene claim."). "[F]or liability to attach" for failure to intervene, "there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557.

#### 2.      Application

Because the Court has denied summary judgment as to the underlying excessive force claim, George and Genoves are not entitled to summary judgment on the basis that there was no underlying constitutional violation. However, George and Genoves may still be entitled to summary judgment if (1) they did not have reason to know that Willis would use force, or (2) there was no realistic opportunity for them to intervene to prevent Willis's deployment of the pepper spray.

29

Whether the officer had a realistic chance to intervene "is normally a question for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Terebesi v. Torreso*, 764 F.3d 217, 244 (2d Cir. 2014) (cleaned up). "[T]he question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." *Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016). The duration of the allegedly unconstitutional conduct "will always be relevant and will frequently assume great importance." *Id.*

The audio of the video reveals that Willis's pepper-spraying of Ross lasted, at most, two seconds. *See* Video at 1:30–1:31. The short duration of the spraying suggests that, once Willis started spraying Ross, George or Genoves would not have had a realistic opportunity to intervene to curb the spraying. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (officers did not have realistic opportunity to intervene where three blows were struck in rapid succession). And Ross does not argue otherwise. Rather, he contends that George and Genoves had approximately 10 seconds between the point at which Willis warned Ross that he would be sprayed if he did not leave his cell and the point at which Willis began to spray. Ross Opp'n at 44–46. For their part, George and Genoves argue that they did not have reason to know that Willis would use force, and, in any event, that they believed, mistakenly but in good faith, that Willis would not do so, entitling them to qualified immunity. *See* CO Mem. at 7–9; CO Reply at 5–8.

Although these arguments have potential to prevail at trial, defendants have not carried their burden on summary judgment. As Ross notes, there are a number of undisputed facts from which a reasonable jury could—but would not be required to—conclude that George and Genoves should have known that Willis was going to use allegedly excessive force.

30

At the outset, as the video shows, George and Genoves were positioned close to Willis and to Ross's bed.  Willis testified that either George or Genoves obeyed his order to grab Ross, Willis Tr. at 89.  This suggests that the officers were close enough to be able to communicate with one another.  Accordingly, a reasonable juror could conclude that George or Genoves were in easy reach of Willis and physically capable of stopping him from spraying Ross.

The focus of George and Genoves's argument is instead that they did not have reason to know in advance that Willis would spray Ross.  *See* CO Mem. at 6–8; CO Reply at 5.  Willis issued a warning that if Ross did not leave his cell, force would be used, thus conditioning the use of force on Ross's continued non-compliance.  George and Genoves argue thus they are the prototypical officers who did not have "reason to know that [excessive force] [would] be used." *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001).  It is also possible, they note, that Willis might have reconsidered the use of force.  They point to this testimony from George:

> Q: Did you have any reason to think that Captain Willis was not going to follow through on using the chemical agent?
>
> A: Sometimes— . . . sometimes—sometimes an officer says I'm—I'm a spray you, and the inmate complies, he don't spray him, so it's 50/50 in a situation like that.
>
> Q: But if—if Mr. Ross didn't comply, did you have any reason to think that Captain Willis wasn't actually going to use the chemical agent?
>
> A: I don't—I mean, can you say that one more time?
>
> Q: Yeah. In the moment when you were inside the cell with Mr. Ross and you heard Captain Willis say I'm going to spray you if you don't comply, did you have any reason to think that Captain Willis would not actually use the spray if Mr. Ross didn't comply?
>
> A: Yes, because sometimes they don't use the spray and they just say I'm going to use spray and then the inmate do comply.
>
> Q: But I'm asking you for the situation when the inmate doesn't comply.  In that situation, do they follow through and use the spray?
>
> A: It depends on the person.  Sometimes they do, sometimes they don't.

George Tr. at 146–47. On this basis, George and Genoves argue that, notwithstanding Willis's

explicit advance warning that he would use force if Ross did not leave his cell, it was possible

that Willis would decide not to do so, and thus they could not have known that he would use

force. They note that had Ross complied, or had Willis abandoned his stated intention to use

force, force would not have been used.

Defendants do not, however, point to any authority that makes it a condition for liability

for failure to intervene in advance to stop a constitutional violation that the defendant have been

certain a violation (here, the use of unjustified force) would occur. For this thesis, defendants

cite only one case, *Henry v. Dinelle*, No. 10 Civ. 0456 (GTS) (DEP), 2011 WL 5975027

(N.D.N.Y. Nov. 29, 2011). There, an inmate was punched and kicked by officers while leaving

the infirmary. *Id.* at *1. Although few factual details are recounted, the *Henry* court explained

that "Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon

after being warned by [a defendant]) that [one of the defendants] punched him one time with a

'closed fist' in the side of his nose, causing him to immediately fall to the ground." *Id.* at *9.

Accordingly, the court concluded, "a rational factfinder could only conclude that the use of force

was simply too uncertain for a reasonable person in [defendant's] position to expect." *Id.*[14] But

*Henry*, by its terms, does not require complete certainty that excessive force would be used; it

merely held that, on the facts, it was "too uncertain" to anticipate a fellow officer's use of force

to hold the accompanying officers liable for failure to intervene. Here, in contrast, Willis's

words to Ross set out a one-factor precondition for the use of the pepper spray: that Ross fail to

---

[14] Ross notes that in *Henry*, the docket reflects that the plaintiff testified that the defendant officer told him, "We're going to give you one more chance. You're not listening. We're going to f *** you up." Ross Opp'n at 43 (quoting *Henry*, No. 10 Civ. 0456, Dkt. 24-4 at 97–99 (N.D.N.Y. Dec. 21, 2010).

leave his cell.  A reasonable juror could conclude that, with Ross remaining stationary if not immobile, George and Genoves had ample notice that Willis—if not stopped by his fellow officers—would pepper-spray Ross, as he had promised.

Defendants next argue that Ross has not pointed to any precedent that holds that a 10-second window is sufficient to give an officer a realistic opportunity to intervene.  CO Reply at 6.  But that is a factual question—and a distinctly case-specific one at that.  Indeed, the Second Circuit has rejected a rule holding that a span of fewer than 30 seconds does not give officers a realistic opportunity to intervene.  *See Figueroa*, 825 F.3d at 107 ("But this does not permit distillation of a hard-and-fast temporal cutoff of the kind relied on by the District Court.").  Here, on their summary judgment motion, the burden is on George and Genoves to demonstrate that the evidence would not permit a rational trier of fact to find that 10 seconds notice gave them sufficient opportunity to intervene.  They have not done so.  On the contrary, the video, showing the close proximity of these two officers to Willis, would give a jury a solid factual basis on which to find a realistic opportunity—on recognizing that Ross, if still in bed, would imminently be pepper-sprayed—to intervene.

Accordingly, the Court denies George and Genoves's motion for summary judgment on Ross's failure-to-intervene claim. [15]

---

[15] Ross argues, in the alternative, that a reasonable jury could find George and Genoves liable for direct participation in the use of excessive force.  *See* Ross Opp'n at 47.  "It is axiomatic that claims under § 1983 for use of excessive force or failure to intervene require personal involvement to trigger liability."  *Demosthene v. City of New York*, 831 F. App'x 530, 535 (2d Cir. 2020) (summary order).  A plaintiff can establish personal involvement either through direct participation or failure to intervene.  *See Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004).

Ross, however, has not pointed to any facts supporting that George or Genoves directly participated in Willis's use of pepper spray.  Ross notes that the officers stood at the threshold of

## C.     Deliberate Indifference

All three defendants, finally, move for summary judgment on Ross's claims of deliberate indifference.

### 1.     Legal Standards

It is well settled that "deliberate indifference to a prisoner's serious illness or injury states a cause of action under [§] 1983." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To establish such a claim, a plaintiff must show, first, that the injury or illness constituted a "serious medical condition." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). A "serious medical condition" is generally understood to be "one that may produce death, degeneration, or extreme pain." *Holmes v. City of New York*, No. 17 Civ. 3874 (WHP), 2018 WL 4211311, at *6 (S.D.N.Y. Sept. 4, 2018). Next, the plaintiff must demonstrate that the defendant acted with deliberate indifference towards that medical condition, so as either to cause it or expose the plaintiff to risk from it. *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). To establish deliberate indifference under the Fourteenth Amendment,

> The plaintiff must show only that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety . . . .

---

his cell as Willis engaged with Ross, and did not notify medical or mental health services before or during the spraying. *See* Ross Opp'n at 48. But that conduct does not establish direct participation. *Cf. Terebesi*, 764 F.3d at 236 n.19 (officer could be held liable as a direct participant despite not throwing grenades into a house, where he "broke a window at the rear of the house and separated the curtains in order to allow the other officers to toss in their grenades"). To the extent Ross would premise § 1983 liability on the part of George and Genoves based on direct participation, as opposed to a failure to intervene, the record does not make such claims viable.

*D.K. by L.K. v. Teams*, 260 F. Supp. 3d 334, 354–55 (S.D.N.Y. 2017) (quoting *Darnell v. Pinerio*, 849 F.3d 17, 35 (2d Cir. 2017)).

Evidence of a defendant's "mere negligence is insufficient" for a plaintiff to succeed on a deliberate indifference claim. *House v. City of New York*, 2020 WL 6891830 (PAE), at *14 (S.D.N.Y. Nov. 24, 2020). And the determinations about "[w]hether the [defendant] knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Washington v. O'Mahony*, No. 16 Civ. 9546 (ER), 2020 WL 1285851, at *5 (S.D.N.Y. Mar. 18, 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

Importantly, these elements differ from deliberate indifference claims arising under the Eighth Amendment. The Second Circuit, in *Darnell*, *supra*, held that it is no longer required that a plaintiff bringing a claim based on the Fourteenth Amendment establish the officer's subjective intent. 849 F.3d at 35 (citing *Kingsley*, and holding that "the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm.").

### 2.    Application

Viewing the facts in the light most favorable to him, Ross has not raised a genuine dispute as to whether Willis's actions with respect to his medical history were anything worse than negligent. It is undisputed that Willis was unaware of Ross's medical history or history of asthma. JSF ¶ 36. And probe teams are generally not informed about patients' medical conditions. *See* Stukes Tr. at 158–59.

Furthermore, Ross admitted that it "slipped [his] mind" to inform Willis and the rest of the probe team, before he was pepper-sprayed, that he was asthmatic. Ross Tr. at 185. Rather, as the video reflects, Ross first told Willis and the probe team that he was asthmatic

approximately 25 seconds after being sprayed.  Video Tr. at 1:58; JSF ¶ 46.  Although captains

like Willis can request and in non-emergency anticipated-use-of-force scenarios should request,

contraindicators to chemical agents, Stukes Tr. at 24, 116–18, 168–69, and although Willis

should have requested contraindicators before spraying Ross, Ross has not alleged any facts to

suggest that Willis's actions rise to the necessary level of objective recklessness.

Ross also fails to adduce evidence permitting the conclusion that Willis knew or should

have known that deploying pepper spray to Ross's face risked imposing a "serious medical

condition."  Once Willis's unawareness of Ross's medical condition is taken into account, the

case law and the facts disfavor this claim.  Although there is "no 'static test' to determine

whether a deprivation [or medical condition] is sufficiently serious," *McNair v. Ponte*, No. 16

Civ. 1722 (LAP), 2019 WL 1428349, at *12 (S.D.N.Y. Mar. 29, 2019), "courts within this

Circuit have previously found that the temporary discomfort caused by pepper spray or mace

does not constitute a 'sufficiently serious' injury" within the meaning of deliberate indifference,

*Lewis*, 2014 WL 1364934, at *7 (citations omitted); *Johnson v. Schiff*, No. 17 Civ. 8000 (KMK),

2019 WL 4688542, at *14 (S.D.N.Y. Sept. 26, 2019) (collecting cases) (If a plaintiff "does not

allege facts suggesting that he suffered permanent effects or serious injury from [] pepper spray,"

then he has failed to allege any factual dispute regarding a "serious medical condition" produced

by the deploying of the pepper spray.).  Indeed, in *Lewis*, where the record supported that the

defendant knew of the plaintiff's asthma, the court dismissed a deliberate indifference claim

predicated solely on the use of OC gel because being asthmatic was not, by itself, a sufficiently

serious condition.  2014 WL 1364934, at *7; *see also Patterson v. Lilley*, No. 02 Civ. 6056

(NRB), 2003 WL 21507345, at *4 (S.D.N.Y. June 30, 2003) ("Being an asthmatic . . . is not a

condition . . . that is severe or 'sufficiently serious.'"); *Paschal-Barros v. Balatka*, No. 18 Civ.

2021 (VLB), 2020 WL 5230994, at *5 (D. Conn. Sept. 1, 2020) ("Courts within the Second Circuit have held that the fact that an inmate is asthmatic does not, by definition, constitute a serious medical need.") (collecting cases)).[16]  The Court in *Lewis*, however, sustained the plaintiff's deliberate indifference claim based on his suffering an asthma attack in the defendant's presence because there were "genuine issues of material fact as to whether Plaintiff actually was experiencing an asthma attack while in pretrial detention" and at the time the gel was deployed.  2014 WL 1364934, at *7; *see also Patterson*, 2003 WL 21507345, at *4 ("The existence of the condition is distinct from the situation in which an inmate is suffering an actual attack.").

Here, as noted, Ross has not pointed to any evidence that he was exhibiting any asthma symptoms at the time the spray was deployed or that he, by then, had informed the officers of his asthma or breathing troubles.  It is clear that being pepper sprayed in the face caused Ross great deal discomfort and pain.  *See* Video at 2:31–3:31 (showing Ross began gasping for air as he was escorted from his cell); *id.* at 3:44–49, 4:08 (Ross telling officers, "I can't breathe.  I can't breathe."); Ross Tr. at 70–71, 116 (Ross testifying that his symptoms were similar to those he experiences during an attack); JSF ¶¶ 50–51 (Ross had to be lifted onto a gurney and wheeled to intake); Video at 6:15 (showing Ross shaking and coughing on gurney in intake area).  Had the officers thereafter denied Ross adequate care in response to these exhibited symptoms, or deployed the agent after Ross began to manifest them, Ross would have a viable basis to claim that Willis's spraying occurred in the face of a known sufficiently serious condition.  But Ross

---

[16] The claims in *Patterson* and *Paschal-Barros* were brought under the Eighth Amendment, and the claim in *Lewis* was brought under the Fourteenth Amendment before the decision in *Darnell*.  But the standards for a "serious medical condition" are the same under the two amendments, and *Darnell* did not disturb this aspect of the analysis.

does not point to such evidence.  *See* Ross Opp'n at 32–36.  Accordingly, his deliberate indifference claim against Willis based on the deployment of the pepper spray must be dismissed.

In any event, Willis would be entitled to qualified immunity because his conduct with respect to ascertaining Willis's medical condition did not violate a clearly established statutory or constitutional right.  *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).  Ross's theory is that "a reasonable officer should have known about Mr. Ross's medical condition before using MK-9 on him" because "DOC policies . . . required officers to check an inmate's contraindications prior to deploying chemical agent in non-emergency anticipated-use-of-force scenarios."  Ross Opp'n at 35.  Ross's claim thus effectively treats the DOC policies as coextensive with his § 1983 claim for deliberate indifference, such that failure to comply with the policy establishes the requisite knowledge on Willis's part.  And because Willis failed to comply with the policies and thereby was unaware of Ross's particular medical vulnerabilities, Ross argues, his decision to pepper spray Ross was objectively reckless and a violation of Ross's clearly established statutory or constitutional rights.  *Id.*

The DOC policies on which this argument rests, however, do not provide Ross with a clearly established statutory or constitutional right.  *See Sandin v. Conner*, 515 U.S. 472, 481–82 (1995) ("[A] prison regulation primarily designed to guide correctional officials in the administration of a prison" is "not designed to confer rights on inmates.").  And Ross has not cited a clearly established constitutional or statutory right to have an officer in the circumstances presented ascertain the inmate's medical profile before commencing pepper-spraying.  Thus, once the DOC policies are put aside, Willis is entitled to qualified immunity on this claim.  *See Quinones*, 2020 WL 6420181, at *5 (quoting *Wesby*, 138 S. Ct. at 589).

It follows that the deliberate indifference claims against George and Genoves, whether based on a theory of direct participation or a theory of failure to intervene to prevent a § 1983 violation by Willis,[17] also fail.  Ross has not adduced evidence that either of these officers, any more than Willis, knew of Ross's medical condition prior to Willis's pepper-spraying.[18]

## CONCLUSION

For the foregoing reasons, the Court denies defendants' motion for summary judgment on Ross's excessive force and failure to intervene claims, and grants defendant's motion as to the deliberate indifference claims.  The Clerk of Court is respectfully directed to terminate the motions pending at dockets 146 and 149.

Barring settlement, the case will now proceed to a jury trial.  Counsel are directed promptly to meet and confer to discuss potential settlement.  If a stipulation of discontinuance has not by then been submitted, the parties are directed, by four weeks from this decision, to submit a joint pretrial order, consistent with the Court's Individual Rules.

---

[17] *See Thawney v. City of New York*, No. 17 Civ. 1881 (PAE), 2018 WL 4935844, at *4 (S.D.N.Y. Oct. 11, 2018) ("It is well established that an officer acts with deliberate indifference if he is aware of an attack, has an opportunity to protect the inmate, and does not intervene."); *Rosen v. City of New York*, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009) ("In the context of a failure to intervene claim, an officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." (cleaned up)).

[18] In light of this ruling, the Court has no occasion to entertain defendants' belated argument that Ross's *pro se* complaint should not be read to encompass a deliberate indifference claim.  *See* Willis Mem. at 22; CO Mem. at 19.

39

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 9, 2021
New York, New York